**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Mark Brasier,<br><br>    Plaintiff,<br><br>v.<br><br>Union Pacific Railroad Company,<br><br>    Defendant. | No. CV-21-00065-TUC-JGZ (MSA)<br><br>**REPORT AND**<br>**RECOMMENDATION** |

   Plaintiff Mark Braiser contends that his former employer, Defendant Union Pacific Railroad Company, discriminated against him based on disability in violation of the Americans with Disabilities Act. Defendant now moves for summary judgment. For the following reasons, the Court will recommend that the motion be granted in part and denied in part.

**Background**[1]

## I.  The Conductor Position

   Plaintiff formerly worked for Defendant as a conductor. (DSOF ¶ 1.) According to the written job description, the conductor is responsible for train operation and movement, performing switching operations, and conducting train and equipment inspections. (DSOF ¶ 3.) This is a safety-sensitive position that involves work on and around tracks with moving trains; as such, it requires constant situational awareness. (DSOF ¶¶ 5–7.) The

---

[1]  "DSOF" refers to Defendant's statement of undisputed material facts. (Doc. 85.) "PSOF" refers to Plaintiff's response statement of facts and statement of additional facts. (Doc. 94.) The following facts are undisputed unless otherwise noted.

conductor's failure to remain alert could result in a catastrophic accident, as Defendant's trains range in size from 6,000 to 8,000 feet in length, weigh anywhere from 5,000 tons to "upwards of multiples of that," and travel though densely populated areas, at times carrying hazardous materials. (DSOF ¶¶ 8–12.)

## II.    Plaintiff's Medical History

### A.    Surgery

In November 2015, Plaintiff received a medical leave of absence after he was diagnosed with a brain tumor. (DSOF ¶ 13.) The following month, Plaintiff underwent surgery to remove the tumor. (DSOF ¶ 14.) The surgeon, Dr. Thomas Scully, had to "open" Plaintiff's dura (the protective covering of the brain beneath the skull) to access the tumor. (DSOF ¶¶ 16–18.) Dr. Scully also "bipolared," or cauterized, through Plaintiff's corpus callosum, which connects the two hemispheres of the brain. (DSOF ¶ 19.)

The parties dispute the significance of these measures. Defendant argues that penetration of the dura creates a high and permanent risk of seizures, regardless of whether penetration is from surgery or from an injury. (DSOF ¶¶ 18, 71–72.) Defendant also argues that involvement of the corpus callosum during surgery is linked to the risk of cognitive impairments. (DSOF ¶ 20.) In response, Plaintiff argues that Defendant wrongly ignores the distinction between traumatic penetration of the dura (e.g., from an injury) and controlled opening of the dura during surgery. (PSOF ¶¶ 18, 176.) The latter, Plaintiff says, is not correlated to an increased risk of seizures. (PSOF ¶¶ 18, 177.) On the next point, Plaintiff concedes that cognitive impairments are a risk of surgery involving the corpus callosum, but he argues the evidence shows that he had no such impairments when he tried to return to work in August 2016. (PSOF ¶ 20.)

### B.    Neuropsychological Evaluations

In 2016, Plaintiff met with Dr. Scott Belanger, a clinical neuropsychologist, for two rounds of neuropsychological testing. (DSOF ¶¶ 28, 37.) Their first meeting occurred in March. (DSOF ¶ 28.) In his report, Dr. Belanger wrote that Plaintiff's "psychometric profile [was] characterized by inconsistencies and areas of relative weakness in processing

speed, complex attention, and visuospatial processing under the pressure of time that likely represent[ed] a decline from a previously higher level of functioning." (DSOF ¶ 29.) Dr. Belanger opined that Plaintiff's issues were "most likely cause[d]" by involvement of the corpus callosum during surgery, and that such issues "could interfere with [his] ability to work as a railroad conductor and engineer." (DSOF ¶¶ 30–33.) Dr. Belanger suggested a follow-up evaluation because it was "certainly possible that [Plaintiff would] show improvement in neurocognitive functioning over time."  (DSOF ¶¶ 32–33.)

Plaintiff's second meeting with Dr. Belanger occurred in August. (DSOF ¶ 37.) In his follow-up report, Dr. Belanger wrote that there had been "improvement in visual processing speed, sustained attention, and vigilance since March," and that Plaintiff's "residual weaknesses f[e]ll almost entirely within normal limits for his age." (PSOF ¶ 194.) At that time, Dr. Belanger did not note any concerns about Plaintiff returning to work. (PSOF ¶ 196.)

## III.   Defendant's Fitness-for-Duty Determination

### A.    The Medical Examiner Handbook

In 2011, Defendant began reviewing its fitness standards for employees in safety-sensitive positions. (DSOF ¶ 51.) Defendant eventually embraced the guidelines set forth in the Federal Motor Carrier Safety Administration's (FMCSA) Medical Examiner Handbook (Handbook). (DSOF ¶¶ 61, 63.) The FMCSA is a federal agency that aims to reduce crashes involving large trucks and buses by developing and enforcing "data-driven regulations that balance motor carrier (truck and bus companies) safety with industry efficiency." (DSOF ¶ 62.) The parties dispute whether the FMCSA continues to endorse use of the Handbook, as well as whether the medical information in the Handbook is outdated. (DSOF ¶¶ 102–03; PSOF ¶¶ 102–03.)

As relevant here, the Handbook provides that surgeries involving "dural penetration" create a "risk for subsequent epilepsy similar to that of severe head trauma," and that severe head trauma creates "a high risk for unprovoked seizures, and the risk does not diminish over time." (DSOF ¶¶ 71–72.) The Handbook also provides that severe head

1   trauma may "produce long-term impairment of cognitive function, including loss of
2   memory and reasoning ability." (DSOF ¶ 72.) Finally, the Handbook is used by Defendant
3   to justify standardized work restrictions for employees who have a risk of sudden
4   incapacitation greater than 1% per year. (PSOF ¶¶ 134–35.)

5   **B.    The Evaluation**

6   Under Defendant's policy, Plaintiff was required to undergo a fitness-for-duty
7   evaluation before returning to work. (DSOF ¶ 48.) Defendant's medical staff requested
8   Plaintiff's medical records, including the operation report, hospital discharge summary,
9   imaging reports, clinic notes, and a return-to-work release from his treating provider.
10  (DSOF ¶ 49.) Defendant received records from Plaintiff in August 2016. (DSOF ¶ 50.) The
11  parties dispute whether those records included Dr. Belanger's second report (the one that
12  noted improvement in Plaintiff's cognitive functioning). Defendant says that Plaintiff did
13  not submit the report in time for his evaluation, and that the report surfaced only after this
14  lawsuit was filed. (DSOF ¶¶ 38, 42–43.) Plaintiff maintains that he forwarded the report
15  along with his other medical records. (PSOF ¶ 38.)

16  Dr. John Charbonneau, Defendant's Associate Medical Director, issued his findings
17  in September 2016. (DSOF ¶¶ 41, 75.) In his written comments, Dr. Charbonneau noted
18  that Plaintiff had undergone surgery involving dural penetration. (DSOF ¶ 76.) Applying
19  the Handbook's guideline on dural penetration, Dr. Charbonneau found that Plaintiff had
20  "an unacceptably high, permanently increased risk of seizures." (DSOF ¶¶ 76, 80.)
21  Dr. Charbonneau also observed, based on Dr. Belanger's first report, that Plaintiff had
22  "unresolved" and "persistent neuropsychological deficits," which "raised questions" about
23  his ability to return to work. (DSOF ¶¶ 76–77, 80.)[2] These findings were reviewed by
24  Dr. John Holland, Defendant's Chief Medical Officer, who agreed that Plaintiff had an
25  unacceptable risk of seizures stemming from dural penetration. (DSOF ¶ 81.)

26  Defendant restricted Plaintiff from (1) operating company vehicles, (2) working on

27  _____

28  [2]    Dr. Charbonneau noted, incorrectly, that Plaintiff had not undergone follow-up neuropsychological testing. (DSOF ¶ 77.) As just noted, the parties dispute whether Plaintiff submitted Dr. Belanger's follow-up report to Defendant before the evaluation.

or near moving trains, unless protected by barriers, (3) operating cranes, hoists, or other machinery, (4) working at unprotected heights of more than four feet, (5) performing work where decisions or actions could affect the safety of others, and (6) performing work involving active control of trains or equipment. (DSOF ¶ 78.) The first four restrictions are permanent, as they are based on the Handbook's guideline on seizure risk from dural penetration. (DSOF ¶¶ 79–80.) The last two are based on Dr. Belanger's first report, and they are subject to review when there is new medical testing showing that Plaintiff's "cognitive/neuropsychological function has returned to normal." (DSOF ¶¶ 79–80.) Plaintiff cannot perform his job as a conductor, or any other job for Defendant, with the restrictions in place. (DSOF ¶¶ 85–86; PSOF ¶¶ 241–42.)

## Legal Standard

A party is entitled to summary judgment if he "shows that there is no genuine dispute as to any material fact and [that he] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is "genuine" if "a reasonable jury could return a verdict for the nonmoving party." *Id.* In determining whether a genuine dispute of material fact exists, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255 (citing *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158–59 (1970)).

## Discussion

Plaintiff alleges two counts for violation of the Americans with Disabilities Act (ADA). In count one, Plaintiff alleges disparate treatment. 42 U.S.C. § 12112(a). In count two, Plaintiff alleges "unlawful screening." *Id.* § 12112(b)(6). Defendant argues that it is entitled to summary judgment on both counts. The Court finds, however, that summary judgment is appropriate only as to count two.

### I.     Disparate Treatment (Count One)

To establish a violation of 42 U.S.C. § 12112(a), the plaintiff must show that (1) he was disabled within the meaning of the ADA, (2) he was qualified for the position, and

1   (3) his employer discriminated against him because of his disability. *E.E.O.C. v. BNSF Ry.*

2   *Co.*, 902 F.3d 916, 922 (9th Cir. 2018). Defendant contends that Plaintiff is unable to prove

3   the first and second elements. The Court disagrees.[3]

4   **A.   There is a material dispute as to whether Plaintiff was disabled.**

5   A person is disabled if (1) he has "a physical or mental impairment that substantially

6   limits one or more major life activities," (2) he has "a record of such an impairment," or

7   (3) he was "regarded as having such an impairment." 42 U.S.C. § 12102(1). Plaintiff

8   asserts that he does not have an actual disability, so only the regarded-as prong is relevant

9   here. This prong is satisfied when the employee suffers an adverse employment action

10   "because of an actual or perceived physical or mental impairment whether or not the

11   impairment limits or is perceived to limit a major life activity." 42 U.S.C. § 12102(3)(A).

12   There is a triable issue as to whether Defendant regarded Plaintiff as disabled.

13   Defendant knew that Plaintiff had undergone brain surgery. Defendant believed that, as a

14   result of the surgery, Plaintiff had cognitive issues and an increased risk of seizures.

15   Because of that belief, Defendant imposed work restrictions that made it impossible for

16   Plaintiff to perform his job. A reasonable jury could conclude from this evidence that

17   Plaintiff was effectively fired "because of" Defendant's fears about his medical condition.

18   42 U.S.C. § 12102(3)(A). This is all that the regarded-as prong requires. *See Lewis v. City*

19   *of Union City*, 934 F.3d 1169, 1182 (11th Cir. 2019) ("[A]n employer that takes an adverse

20   action because it fears the consequences of an employee's medical condition has regarded

21   that employee as disabled.").

22   This conclusion is supported by the Equal Employment Opportunity Commission's

23   (EEOC) interpretive guidance for the ADA regulations. The EEOC, which promulgated

24   the regulations, has stated that "[c]overage under the 'regarded as' prong of the definition

---

25   [3]      In general, discrimination claims are analyzed using the burden-shifting framework
26   set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Curley v. City of North Las Vegas*, 772 F.3d 629, 632 (9th Cir. 2014). Plaintiff argues that the framework
27   does not apply to his case because he has produced direct evidence of discrimination. *See France v. Johnson*, 795 F.3d 1170, 1173 (9th Cir. 2015) (stating that the framework does
28   not apply when the plaintiff "presents direct evidence of a discriminatory motive"). While Defendant disputes this point, it has nevertheless agreed to dispense with the framework for purposes of summary judgment.

of disability should not be difficult to establish." 29 C.F.R. Pt. 1630, app. to § 1630.2(*l*). "To illustrate how straightforward application of the 'regarded as' prong is," the EEOC provided several examples of when the prong would be met. *Id.* Relevant here, "an employer who terminates an employee with angina from a manufacturing job that requires the employee to work around machinery, believing that the employee will pose a safety risk to himself or others if he were suddenly to lose consciousness, has regarded the [employee] as disabled." *Id.* The present facts are materially analogous: Defendant issued work restrictions because it feared that Plaintiff's cognitive issues and increased risk of seizures made him an unsafe employee. Thus, a jury could reasonably find that Plaintiff was regarded as disabled. *See Nunies v. HIE Holdings, Inc.*, 908 F.3d 428, 434–45 (9th Cir. 2018) (finding a triable issue under the regarded-as prong where the employer effectively fired the plaintiff days after learning about his shoulder pain).

Defendant argues that to succeed on a regarded-as claim, the plaintiff must present evidence that he was subjected to an adverse employment action because of "myths" or "stereotypes" about the disabled. Further, Defendant says, an employment decision is not based on myths or stereotypes when, as here, it is made pursuant to a doctor's recommendation. Defendant emphasizes that the ADA authorizes medical evaluations when there is a legitimate concern that an employee's medical condition will affect his ability to perform his job. 42 U.S.C § 12112(d)(4)(A). According to Defendant, finding the regarded-as prong satisfied on these facts would "thwart the purpose of" § 12112(d)(4)(A), because that would "mean employers may *consider* a safety risk, just never *do* anything about it."

This argument is not persuasive. To begin with, it misrepresents the framework for ADA liability. Defendant portrays itself as in an impossible situation: "restrict an employee [based on a medical recommendation] and face ADA liability, or roll the dice and hope the health condition will not cause an accident." The actual situation, however, is not so dire. Liability does not necessarily follow from satisfaction of the regarded-as prong. For instance, an employer can regard its employee as disabled (the first element of the

plaintiff's prima facie case) but avoid liability because the employee is not "qualified" (the second element). Indeed, Defendant separately argues that Plaintiff cannot prove he was qualified for his position.

Furthermore, even if a plaintiff satisfies his prima facie case, the employer can avoid liability by proving an affirmative defense. *See* 29 C.F.R. § 1630.15 (setting forth various affirmative defenses to ADA liability). The determination whether an employer "can ultimately establish a defense to liability is an inquiry separate from, and follows after, a determination that an individual was regarded as having a disability." 29 C.F.R. Pt. 1630, app. to § 1630.2(*l*). In other words, an employer can regard an employee as disabled *and* be legally justified in doing so. 29 C.F.R. § 1630.2(*l*)(2) ("[A]n individual is 'regarded as having such an impairment' any time a covered entity takes a prohibited action against the individual because of an actual or perceived impairment, even if the entity asserts, or may or does ultimately establish, a defense to such action."). Defendant's attempt to frame the issue otherwise is not persuasive.

Next, and more importantly, Defendant's argument is not supported by any binding authority. The phrase "regarded as having such an impairment" is defined by both statute and regulation. 42 U.S.C. § 12102(3); 29 C.F.R. § 1630.2(*l*). Neither provision mentions any myths-or-stereotypes requirement, nor does any binding case from this circuit apply such a requirement. In fact, this circuit has found a triable issue under the regarded-as prong simply because an employer took an adverse employment action after learning about the plaintiff's shoulder injury. *Nunies*, 908 F.3d at 434–35. That court's analysis contains no mention about whether the action was based on myths or stereotypes about the disabled.

Moreover, the EEOC's interpretive guidance confirms there is no such requirement: "Where an employer bases a prohibited employment action on an actual or perceived impairment that is not 'transitory and minor,' the employer regards the individual as disabled, *whether or not myths, fears, or stereotypes about disability motivated the employer's decision*." 29 C.F.R. Pt. 1630, app. to § 1630.2(*l*) (emphasis added). "While not binding, the guidance illustrates the common sense principle that an employer that takes

an adverse action because it fears the consequences of an employee's medical condition has regarded that employee as disabled." *Lewis*, 934 F.3d at 1181–82 (relying on the EEOC's interpretive guidance to reject an argument similar to Defendant's).

Defendant's argument is based on the pre-amendment version of the regarded-as prong. That provision was satisfied only if the employer "mistakenly believed" that its employee was "substantially limited" by a real or perceived impairment. *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 489 (1999), *superseded by statute*, ADA Amendments Act of 2008, Pub. L. No. 110-325, 122 Stat. 3553 (2008). An employee could make that showing with evidence that his employer "made an employment decision because of a perception of disability based on 'myth, fear or stereotype.'" Equal Employment Opportunity for Individuals with Disabilities, 56 Fed. Reg. 35,726, 35,743 (July 26, 1991). This was because, at the time the ADA was enacted, it was already well-recognized that "society's accumulated myths and fears about disability and disease are as handicapping as are the . . . limitations that flow from actual impairment." *Sch. Bd. of Nassau Cnty. v. Arline*, 480 U.S. 273, 284 (1987).

The 2008 amendments added a new provision to the regarded-as prong. The statute now provides that an employee is "regarded as having such an impairment" if he is subjected to an adverse employment action "because of an actual or perceived physical or mental impairment *whether or not the impairment limits or is perceived to limit a major life activity*." 42 U.S.C. § 12102(3)(A) (emphasis added). This provision "broadened the application of the 'regarded as' prong of the definition of disability" by "reject[ing] court decisions [like *Sutton*] that had required an individual to establish that a covered entity perceived him or her to have an impairment that substantially limited a major life activity." 29 C.F.R. Pt. 1630, app. to § 1630.2(*l*). What does this mean? It means that ADA protection covers more than just those who were discriminated against based on myths or stereotypes. Thus, there is no need to show that the employer discriminated for that specific reason. *Id.* ("Where an employer bases a prohibited employment action on an actual or perceived impairment that is not 'transitory and minor,' the employer regards the individual as

1  disabled, whether or not myths, fears, or stereotypes about disability motivated the

2  employer's decision.").

3      Plaintiff has presented evidence that he suffered an adverse employment action

4  because Defendant feared the consequences of his medical condition. Therefore, there is a

5  triable issue as to whether Defendant regarded him as disabled. None of the cases cited by

6  Defendant for the opposite conclusion are binding or persuasive. In fact, most of them

7  involve an application of the pre-amendment law. *See, e.g.*, *Jones v. United Parcel Serv.,*

8  *Inc.*, 502 F.3d 1176, 1190 (10th Cir. 2007) (applying *Sutton*'s requirement that "the

9  employer must mistakenly believe that [an] impairment substantially limits the

10  employee"); *Carrillo v. Union Pac. R.R.*, No. EP-21-CV-00026, 2022 WL 3224000, at

11  *6–8 (W.D. Tex. Aug. 9, 2022) (noting that the 2008 amendments broadened the regarded-

12  as prong but nevertheless adopting the narrower analysis from *Jones*), *appeal docketed*,

13  No. 22-50782 (5th Cir. Sep. 1, 2022). The Court declines to follow them.

14      **B.    There is a material dispute as to whether Plaintiff was qualified.**

15      There is a two-step inquiry for determining whether a person was qualified. *Bates*

16  *v. United Parcel Serv., Inc.*, 511 F.3d 974, 990 (9th Cir. 2007) (en banc). Only the second

17  step is disputed here. To satisfy this step, the plaintiff must show that he could "perform

18  the essential functions" of his position, "with or without reasonable accommodation."

19  42 U.S.C. § 12111(8). The plaintiff must show that he "was qualified at the time of the

20  adverse employment action, rather than at some earlier or later time." *Anthony v. Trax Int'l*

21  *Corp.*, 955 F.3d 1123, 1129 (9th Cir. 2020).

22      Defendant's fitness determination occurred in September 2016. (DSOF ¶ 75.) The

23  essential function at issue is that conductors must, at times, make "quick decisions under

24  pressure to keep the train and its crew safe." (DSOF ¶ 5.) Therefore, the relevant inquiry is

25  whether, in September 2016, Plaintiff was capable of making appropriate decisions under

26  time and pressure constraints. The Court finds that there is a triable issue as to whether

27  Plaintiff could perform that function on that date.

28      In April 2016, Dr. Belanger wrote that Plaintiff's "weakness in visual processing

- 10 -

1   speed, sustained attention, vigilance, and divided attention in particular could disrupt his
2   ability to make time-sensitive decisions." (DSOF ¶ 32.) Dr. Belanger expressed concern
3   that these "cognitive difficulties could interfere with Mr. Braiser's ability to work as a
4   railroad conductor and engineer." (DSOF ¶ 32.) In August 2016, however, Dr. Belanger
5   wrote that Plaintiff had experienced "improvement in visual processing speed, sustained
6   attention, and vigilance since March," and that his "residual weaknesses f[e]ll almost
7   entirely within normal limits for his age." (PSOF ¶ 194.) Dr. Belanger did not, as he had
8   done in the first report, express concern about Plaintiff returning to work. (PSOF ¶ 196.)

9       In August 2016, Plaintiff also saw his neurosurgeon, Dr. Scully. (PSOF ¶ 197.)
10  Dr. Scully's treatment notes reflect that Plaintiff had had no symptoms or seizures, and that
11  Plaintiff had been off medication for months. (PSOF ¶ 197.) After talking to Plaintiff about
12  his job responsibilities, Dr. Scully provided a letter releasing Plaintiff to "full duty" with
13  "no restrictions." (PSOF ¶¶ 198–99.) Plaintiff was also released to work "without any
14  restrictions" by his treating neurologist, Dr. Sarah Sullivan, and nurse practitioner, Eric
15  Holder. (PSOF ¶ 205.)

16      Dr. Belanger's reports indicate that while Plaintiff initially experienced cognitive
17  issues, those issues had resolved before Defendant's fitness evaluation. In addition, before
18  the evaluation, two other doctors and a nurse practitioner released Plaintiff to work without
19  restriction. A reasonable jury could rely on this medical evidence to find that, in September
20  2016, Plaintiff was capable of making appropriate decisions under time and pressure
21  constraints. *See Melo v. City of Somerville*, 953 F.3d 165, 171–72 (1st Cir. 2020) (finding
22  a triable issue as to whether the plaintiff was qualified because "the record contain[ed]
23  conflicting competent medical evidence" concerning his ability to perform his job safely).

24      Defendant argues that Plaintiff was not qualified because Dr. Belanger, in his first
25  report, expressed doubt that Plaintiff could make time-sensitive decisions, and it was based
26  on that report that Plaintiff was restricted from decision-making. "An employee restricted
27  from essential functions by his own physician is not qualified as a matter of law,"
28  Defendant says. Defendant also argues that Dr. Belanger's second report cannot create a

1   triable issue, because Plaintiff did not provide it to Defendant before the fitness evaluation.

2   In fact, Defendant argues, the report did not surface until discovery in this lawsuit, and

3   Plaintiff has no evidence that he produced it earlier. Defendant contends that, with the

4   second report out of the picture, the evidence shows indisputably that Plaintiff could not

5   perform the essential functions of his job in September 2016.

6          This argument is not persuasive. Even if Dr. Belanger's second report is excluded

7   from consideration, the medical evidence would still be in conflict—and thus there would

8   still be a triable issue—because Plaintiff was released to work without restriction by

9   Dr. Scully, Dr. Sullivan, and nurse practitioner Holder. Defendant raises various attacks on

10  these providers' opinions (e.g., Dr. Scully gave no weight to the problems documented in

11  Dr. Belanger's first report), but it is not the Court's function at this stage to weigh evidence.

12  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Plaintiff's neurosurgeon and

13  treating providers believed he could perform his job without restriction. A jury could

14  reasonably rely on that evidence.

15         Moreover, Defendant is wrong that there is no evidence it received Dr. Belanger's

16  follow-up report in August 2016. Plaintiff testified, albeit somewhat unsurely, that he

17  included the report in the same package that contained all his other medical documents:

18         Q: Did you provide this report to Union Pacific?
           A: Yes.
19         Q: How did you do so?
20         A: I don't recall. I probably faxed or e-mailed it with all my other return
           paperwork. If it was August, it was part of my return to work package.
21         Q: Who did you send it to?
22         A: I don't recall.
           Q: Are you confident that you faxed it?
23         A: I would assume that I sent it to the same person I send all the others to,
           which would be Bridgette Ziemer.
24         Q: Do you have any evidence of faxing it to Ms. Ziemer?
25         A: I don't other than the cover sheet that you guys would have.
           Q: I'm not trying to trick you at all. I do not have any records of this
26         document, or I'm not aware of this document being faxed or otherwise
           provided to UP. So I'm just trying to determine if you have any independent
27         recollection of this particular exam being sent to UP, and who it was sent to?
28         A: I don't recall. All I know is it was part of my package of everything that I

sent, because I had multiple documents from multiple physicians during this
time.
Q: How do you know that this particular document that we're looking at . . .
was part of that package?
A: It had to be, because it was part of my return to work evaluations.

(PSOF ¶ 38; Doc. 95-2 at 20–21.)

Defendant offers various reasons as to why this testimony should not be believed.
Defendant points out that, during discovery, Plaintiff was unable to produce any records
showing he faxed or otherwise submitted the report in 2016. (DSOF ¶ 40.) Defendant next
emphasizes that Plaintiff's own expert did not learn about the report until after drafting his
initial expert report. (DSOF ¶ 44.) Finally, Defendant points out that Plaintiff checked a
box on Dr. Belanger's intake form to indicate that he did not want the report released to
family or friends. (Doc. 102-1 at 39.)

To be sure, this evidence casts doubt on Plaintiff's testimony. None of it, however,
disproves the testimony. Moreover, whether Plaintiff provided the report to Defendant in
August 2016 is material because the report indicates—contrary to what Defendant found—
that Plaintiff could perform the decision-making function of the conductor job. "If the
nonmoving party produces direct evidence of a material fact, the court may not assess the
credibility of this evidence nor weigh against it any conflicting evidence presented by the
moving party. The nonmoving party's evidence must be taken as true." *T.W. Elec. Serv.,*
*Inc. v. Pac. Elec. Contractor's Ass'n*, 809 F.2d 626, 631 (9th Cir. 1987). Plaintiff's
testimony is direct evidence that Defendant had the report in August 2016, so the Court
must accept it as true. *See Leslie v. Grupo ICA*, 198 F.3d 1152, 1158–59 (9th Cir. 1999)
(accepting the plaintiff's deposition testimony as true for purposes of summary judgment
although it "appear[ed] to contradict" his prior written statements).

In concluding its argument on this element, Defendant asserts that it was reasonable
to issue restrictions based on Dr. Belanger's first report, even if there was conflicting
medical evidence available. However, in determining whether there is a triable issue on a
plaintiff's prima facie case, the court may not find as a matter of law that the defendant
reasonably chose among conflicting medical opinions. In fact, conflicting medical

evidence is a good indicator that a triable issue exists. Defendant's argument is relevant towards whether Plaintiff was a "direct threat," which is an affirmative defense that Defendant has the burden of proving. *Nunes v. Wal-Mart Stores, Inc.*, 164 F.3d 1243, 1247 (9th Cir. 1999). Indeed, both quotations presented in support of Defendant's argument were taken from a direct-threat analysis. *Michael v. City of Troy Police Dep't*, 808 F.3d 304, 307 (6th Cir. 2015); *Coleman v. Pa. State Police*, 561 F. App'x 138, 145 n.13 (3d Cir. 2014).

**C.     There is a material dispute as to whether Plaintiff was a direct threat.**

An employer can avoid liability by establishing that its employee posed a "direct threat." 42 U.S.C. § 12113(b). This term means "a significant risk of substantial harm to the health or safety of the individual or others that cannot be eliminated or reduced by reasonable accommodation." 29 C.F.R. § 1630.2(r). A direct-threat determination must result from an "individualized assessment of the individual's present ability to safely perform the essential functions of the job." *Id.* The assessment, in turn, must be "based on a reasonable medical judgment that relies on the most current medical knowledge and/or on the best available objective evidence." *Id.* An employer must consider four factors when determining whether an employee poses a direct threat: "(1) The duration of the risk; (2) The nature and severity of the potential harm; (3) The likelihood that the potential harm will occur; and (4) The imminence of the potential harm." *Id.*

Defendant has not shown, as a matter of law, that Plaintiff was a direct threat. Four of the six work restrictions it imposed were based on the Handbook's guideline on dural penetration. (DSOF ¶¶ 76, 80.) The guideline provides that a traumatic brain injury involving dural penetration produces a "high risk for unprovoked seizures, and the risk does not diminish over time." (DSOF ¶ 72.) The guideline likens this risk to the risk associated with controlled opening of the dura during surgery. (DSOF ¶ 71.) In other words, the Handbook provides that controlled, surgical opening of the dura produces a high risk of seizures that never diminishes. The Handbook also provides that individuals with such risk "should not be considered eligible for certification." (DSOF ¶ 71.) Here, noting that Plaintiff's dura was opened during surgery, Dr. Charbonneau and Dr. Holland applied

1    the Handbook to find that Plaintiff had "an unacceptably high, permanently increased risk

2    of seizures." (DSOF ¶¶ 76, 81.)

3         Plaintiff has presented evidence calling into question the medical soundness of the

4    Handbook's guideline—and thus the reasonableness of Defendant's reliance on it. In 2009,

5    a medical expert panel, consisting of experts in neurology and occupational medicine,

6    submitted a report to the FMCSA concerning the Handbook's provisions on traumatic brain

7    injury. (Doc. 94-7 at 4.) The panel concluded that people who have such injuries should be

8    permanently prohibited from commercial driving, in part because of an increased risk of

9    seizures. (*Id.* at 5–6.) As to those who have had surgery involving controlled dural

10   penetration, the panel provided the following remarks:

> The issue of seizure risk following surgical penetration of the dura (i.e.,
> craniotomy) was also discussed by the [panel] at great length. It was
> acknowledged that assigning risk to seizures after craniotomy is often very
> difficult given that the risk is dependent on several factors such as the type
> and location of the surgery and the underlying reason for the surgery. Fully
> assessing the risk of seizure (and other factors which may impair driving
> ability) post craniotomy was outside the scope of the Evidence Report and
> given the inherent difficulties in determining the level of seizure risk
> associated with different types of craniotomies, the [panel] decided to abstain
> from providing opinions on this topic. The panel suggests that the FMCSA
> further investigate this issue and evaluate the risk of seizures associated with
> specific types of craniotomy and update this accordingly.

19   (*Id.* at 6.)

20        Although the panel refrained from issuing any guidance, these remarks suggest that

21   there is a distinction between traumatic penetration of the dura from injury and controlled

22   opening of the dura during surgery. That is, while the panel thought it appropriate to

23   categorically exclude those who had traumatic brain injuries, it declined to give the same

24   opinion as to those who had dural penetration during surgery. (*Id.* at 5–6.) Instead, the

25   panel recognized that seizure risk "depend[s] on several factors," including the "type and

26   location of the surgery and the underlying reason for the surgery." (*Id.* at 6.)

27        Other evidence supports finding that there is a meaningful distinction between

28   controlled, surgical penetration and penetration from a traumatic injury. Plaintiff's expert,

Dr. Michael Deveraux, testified that comparing the two is "ridiculous" and like "comparing apples and oranges." (Doc. 96-9 at 17.) As to surgery patients, he testified that seizure risk depends on several "factors," including "the type of operation," the occurrence of "seizures before the [surgery] that lead to the diagnosis," and "early seizures in the first week [following surgery]." (*Id.* at 19, 29–30.) Similarly, Dr. Scully identified a distinction between controlled surgical penetration, traumatic penetration (e.g., from a gunshot), and inadvertent surgical penetration (e.g., from drilling too far). (Doc. 94-10 at 12.) He testified, based on his "neurosurgical knowledge," that seizure risk will be greater from traumatic or inadvertent penetration. (*Id.*) He also testified that factors relevant to seizure risk include the location of the brain tumor, the presence of certain underlying medical conditions, and the occurrence of seizures following surgery. (*Id.* at 9.) He explained that the location of Plaintiff's tumor is not correlated to an increased risk of seizures, and that Plaintiff had returned to his pre-surgery risk level after six months. (*Id.* at 9, 13.)

This evidence indicates that, as to seizure risk, there is a material difference between traumatic dural penetration and controlled dural penetration. It also indicates that the risk associated with the latter depends on numerous factors (e.g., the location of the tumor, the type of surgery, preexisting medical conditions, a history of seizures before surgery, the occurrence of seizures following surgery, etc.). The Handbook does not recognize any such distinction, nor does it instruct medical examiners to consider any factors when determining a surgery patient's seizure risk. (*See* Doc. 96-9 at 29.) Instead, the Handbook effectively equates traumatic penetration with controlled penetration and, as a result, instructs examiners to apply a categorical bar. (Doc. 85-19 at 60, 81.)

Given the conflicting evidence, a reasonable jury could find that the Handbook's guideline did not represent the "most current medical knowledge," and that it was unreasonable for Defendant's doctors to rely on it. 29 C.F.R. § 1630.2(r); *see Echazabal v. Chevron USA, Inc.*, 336 F.3d 1023, 1028–29 (9th Cir. 2003) (finding a triable issue based on evidence that the defendant relied on scientifically irrelevant test results). In addition, given Dr. Charbonneau's and Dr. Holland's application of a strict guideline, and apparent

1   failure to consider any of the factors set forth above, there is a triable issue as to whether

2   they really performed an "individualized assessment" of Plaintiff's condition. *Id.*

3          There is also a triable issue as to the objective reasonableness of the last two work

4   restrictions. These were based on Dr. Belanger's first report, which documents the

5   cognitive issues that Plaintiff was experiencing in March 2016. (DSOF ¶¶ 76, 80.) As

6   previously explained, Dr. Belanger's follow-up report indicates that Plaintiff's issues had

7   resolved by August 2016, and there is evidence that Defendant had the report at the time

8   of its fitness evaluation the following month. Because Defendant's doctors considered only

9   the first report, a reasonable jury could find that they did not rely on "the best available

10  objective evidence" when issuing the restrictions. 29 C.F.R. § 1630.2(r).

11         Finally, application of the regulatory factors supports finding that there is a triable

12  issue. For present purposes, the Court assumes that factor one (duration of the risk) and

13  factor two (nature and severity of the potential harm) favor Defendant. Even still, a

14  reasonable jury could find for Plaintiff on factor three (likelihood that the potential harm

15  will occur) and factor four (imminence of the potential harm). Plaintiff presents evidence

16  that his seizure risk depends on numerous factors, and that, under a proper analysis, his risk

17  is the same as it was before his surgery (when he had worked for Defendant for ten years

18  without having a seizure (*see* Doc. 92-6)). He also presents evidence that his cognitive

19  issues had resolved by August 2016. This evidence supports finding that the potential harm

20  was neither likely nor imminent.

21         Defendant's argument in support of summary judgment has several components,

22  none of which are persuasive. Defendant first suggests that it is always reasonable to follow

23  the Handbook. Defendant points out that several courts have approved of its reliance on

24  the Handbook in the direct-threat context, and it cites a few cases stating it is reasonable to

25  rely on government-endorsed standards. None of those courts, however, found it

26  reasonable as a matter of law to apply the guideline on dural penetration to a surgery

27  patient. Furthermore, government-endorsed standards are not immune to criticism. Here,

28  for instance, the medical expert panel did not recommend the standard ultimately adopted

1    by the FMCSA, and Plaintiff's expert believes the standard is wrong. In addition, the

2    information in the Handbook is currently being updated and revised. (DSOF ¶ 101.)

3         Defendant also argues that its "Medical Comments History . . . removes any doubt

4    about the expressly individualized nature" of its evaluation, as it "showcases the many

5    touchpoints between Union Pacific and Braiser, and highlights the diligence of Union

6    Pacific's medical department in evaluating Braiser's medical condition." But while the

7    Medical Comments History reflects that Dr. Charbonneau reviewed Plaintiff's record, it

8    does not necessarily follow that the evaluation was sufficiently individualized. Plaintiff's

9    evidence indicates that a proper evaluation of his seizure risk would have taken into

10   account numerous factors. Dr. Charbonneau did not consider any factors; instead, he zeroed

11   in on a single point in Plaintiff's record—that Plaintiff's dura was opened during surgery—

12   and concluded based on the Handbook that Plaintiff has a high risk of seizures that will

13   never diminish. In effect, application of that allegedly erroneous standard rendered the

14   review of Plaintiff's other circumstances meaningless.[4]

15        Furthermore, on this same point, "this Circuit has cautioned that individualized risk

16   assessment also requires consideration of relevant information about an employee's past

17   work history." *Echazabal*, 336 F.3d at 1032; *see Nunes*, 164 F.3d at 1248 (stating that the

18   direct-threat "analysis necessarily requires the employer to gather 'substantial information'

19   about the employee's work history and medical status" (quoting *Mantolete v. Bolger*, 767

20   F.2d 1416, 1422 (9th Cir. 1985))). There is no indication that Defendant made such an

21   evaluation here. Defendant's response to this criticism is to offer an inapposite analogy:

22   "A pilot qualified on Monday and stricken blind on Tuesday does not remain qualified

23   [based on his work history] on Wednesday." Plaintiff was not stricken blind; the issue is

24   whether he presented an unacceptable seizure risk. He has presented evidence that, in

25   September 2016, his risk was at the pre-surgery level. Before the surgery, Plaintiff had

26   _____

     [4]    In support of its direct-threat argument, Defendant points out that Plaintiff has
27   encephalomalacia (brain scarring), a condition which may produce a higher risk of
     seizures. (DSOF ¶¶ 45–47.) This does not help Defendant's argument. The analysis must
28   focus on Defendant's actual assessment. The Medical Comments History contains no
     mention of Plaintiff's brain scarring, and Defendant does not otherwise show that that
     condition factored into its decision.

worked for Defendant for ten years without having a seizure. This work history is relevant.

Finally, Defendant attempts to cast the dispute as a mere disagreement of medical opinion. Defendant argues that its doctors' conclusions are reasonable, so it does not matter if the conclusions of Plaintiff's doctors are also reasonable. Nor does it matter, Defendant says, if Plaintiff's doctors can find things to "nitpick" about its doctors' conclusions.

The Court disagrees with Defendant's characterization of this case. Plaintiff's expert believes that Defendant's doctors applied the wrong standard. This is more than a mere difference of medical opinion. If a jury agrees, it could find that Defendant's error infected the entire evaluation, and that Defendant's medical judgment was consequently unreasonable. *See Echazabal*, 336 F.3d at 1032 ("These statements were not, as Chevron implies, merely differences of medical opinion. In several instances, [Echazabal's doctors] declared that Chevron doctors were simply wrong in their assessment of Echazabal's condition and that their analysis is inconsistent with the literature on liver function."); *Nall v. BNSF Ry. Co.*, 917 F.3d 335, 345 (5th Cir. 2019) ("Even if it is true that BNSF could choose to credit the opinions of its own doctors over Nall's, the evidence identified by Nall puts into question the objective reasonableness of those opinions."). The Court will recommend that summary judgment on count one be denied.

## II.     Unlawful Screening (Count Two)

Discrimination under the ADA includes "using qualification standards, employment tests or other selection criteria that screen out or tend to screen out" disabled people "unless the standard, test or other selection criteria . . . is shown to be job-related for the position in question and is consistent with business necessity." 42 U.S.C. § 12112(b)(6). Here, Plaintiff challenges Defendant's policy to impose restrictions on employees who have a greater than 1% chance of sudden incapacitation per year. The Court finds that summary judgment is appropriate on this claim.

As an initial matter, the parties dispute whether Plaintiff's screening claim is based on a theory of disparate treatment, disparate impact, or both. While it is not clear how the claim can be based on both theories, which is what Plaintiff argues, this dispute ultimately

1    is immaterial.[5] Regardless of the theory, to challenge the 1% policy, Plaintiff must present

2    evidence showing that the policy was applied to him. *See Murray v. Mayo Clinic*, 934 F.3d

3    1101, 1107 (9th Cir. 2019) (holding that "ADA discrimination claims under Title I must

4    be evaluated under a but-for causation standard"). Here, he presents the following as a

5    statement of undisputed material fact: "Dr. Charbonneau never concluded that Braiser had

6    a greater than 1% risk of sudden incapacitation, as required by Dr. Holland's guidelines."

7    (PSOF ¶ 220.) In addition, while Plaintiff asserts that Dr. Charbonneau's opinion was

8    subject to confirmation by Dr. Holland (a fact which is disputed), he points to no evidence

9    that Dr. Holland applied the 1% policy either. (PSOF ¶¶ 221–22.)

10        Plaintiff concedes that he was not screened out pursuant to the 1% policy, so

11    summary judgment is appropriate. As a final note on this point, although it seems apparent

12    that Defendant's doctors believe Plaintiff's risk of sudden incapacitation is greater than 1%

13    per year, the Court agrees with Defendant that the existence of the 1% policy should not

14    be confused with its use. Plaintiff presents no evidence that Defendant's doctors had the

15    policy in mind when they issued his restrictions. To the contrary, as just noted, he admits

16    it was not a consideration.

17        A disparate-impact claim fails for at least two other reasons. First, simply by arguing

18    that Plaintiff has no evidence of causation (statistical or otherwise), Defendant has shifted

19    the burden to Plaintiff to come forward with evidence showing that the 1% policy has a

20    discriminatory impact on disabled individuals. *See Fairbank v. Wunderman Cato Johnson*,

21    212 F.3d 528, 532 (9th Cir. 2000) (explaining that "a moving defendant may shift the

22    burden of producing evidence to the nonmoving plaintiff merely by 'showing'—that is,

---

23    [5]    The disparate-treatment theory requires evidence that a "protected trait . . . actually

24    motivated the employer's decision." *Raytheon Co. v. Hernandez*, 540 U.S. 44, 52 (2003)
    (quoting *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610 (1993)). Thus, in the context of a
    screening claim, the policy at issue must, on its face, evidence some discriminatory motive.

25    *See Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 988 (9th Cir. 2007) (en banc)
    (examining a policy that was "facially discriminatory . . . because it focuse[d] directly on

26    an individual's disabling or potentially disabling condition"). The disparate-impact theory,
    in contrast, "involve[s] employment practices that are facially neutral in their treatment of

27    different groups but that in fact fall more harshly on one group than another . . . ." *Raytheon
    Co.*, 540 U.S. at 52 (quoting *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 335–36

28    n.15 (1977)). Thus, Plaintiff argues that the same policy is both facially discriminatory *and*
    facially neutral.

1   pointing out through argument—the absence of evidence to support plaintiff's claim").

2   Plaintiff fails to meet his burden, as he has not presented any evidence that Defendant's

3   policy disproportionately affects disabled individuals. While he offers counterargument,

4   that is not enough. *See Nissan Fire & Marine Ins. v. Fritz Cos.*, 210 F.3d 1099, 1103 (9th

5   Cir. 2000) (explaining that if "a moving party carries its burden of production, the

6   nonmoving party *must produce evidence* to support its claim" (emphasis added)).

7       Second, Plaintiff did not timely raise a disparate-impact claim in his administrative

8   charge of discrimination. Plaintiff filed his charge in April 2020, years after the alleged

9   discrimination. (DSOF ¶ 107.) Therefore, unless tolling applies, his charge was untimely,

10  and his claim is barred. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 110

11  (2002) (stating that a charge must be filed within 300 days of the allegedly discriminatory

12  act); *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393 (1982) (stating that the charge-

13  filing period is subject to tolling).

14      Plaintiff attempts to invoke class-action tolling based on his status as a class member

15  in *Harris v. Union Pacific Railroad Co.* Generally, the filing of a class action tolls the

16  statute of limitations as to all putative class members until class certification is denied.

17  *Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345, 353–54 (1983) (quoting *Am. Pipe &*

18  *Constr. Co. v. Utah*, 414 U.S. 538, 554 (1974)). In addition, when the named plaintiffs

19  move for class certification on less than all the class claims, tolling ceases as to the claims

20  that are omitted. *See Blankinship v. Union Pac. R.R.*, No. CV-21-00072-TUC, 2022 WL

21  4079425, at *5 (D. Ariz. Sept. 6, 2022), *appeal docketed*, No. 22-16849 (9th Cir. Dec. 2,

22  2022). This is because the class-action device "both permits and encourages class members

23  to rely on the named plaintiffs to press their claims." *Crown, Cork & Seal Co.*, 462 U.S.

24  at 352–53. When the named plaintiffs abandon a class claim, class members no longer have

25  reason to believe that their individual claims will be protected.

26      The named plaintiffs in *Harris* alleged class claims for disparate treatment and

27  disparate impact. (DSOF ¶ 104.) In August 2018, however, they moved for class

28  certification only on the disparate-treatment claim. (DSOF ¶ 105.) By not seeking

- 21 -

certification of the disparate-impact claim, the named plaintiffs abandoned it on a class-wide basis, and tolling ceased. Therefore, Plaintiff had 300 days—until June 2019—to file a charge of discrimination. Plaintiff filed his charge in April 2020, so his charge was untimely, and his claim is barred. Notably, several district courts have reached the same conclusion in other follow-on cases to the *Harris* class action. *Blankinship*, 2022 WL 4079425, at *5; *Smithson v. Union Pac. R.R.*, —— F. Supp. 3d ——, 2022 WL 1506288, at *3–4 (W.D. Tex. 2022); *Carrillo v. Union Pac. R.R.*, No. EP-21-CV-00026, 2021 WL 3023407, at *5–6 (W.D. Tex. July 16, 2021). The Court finds these cases persuasive.

Plaintiff argues that tolling continued for his disparate-impact claim because it shares the same factual basis as the class claim for disparate treatment. *See Zaragoza v. Union Pac. R.R.*, —— F. Supp. 3d ——, 2022 WL 2145556, at *4–5 (W.D. Tex. 2022) (holding that the plaintiff's disparate-impact claim, which challenged a color-vision test, was tolled based on the *Harris* class claim for disparate treatment). But Plaintiff has not established that the two claims share the same factual basis. He argues this Court has already made that finding, but the statement he references involved a comparison to the previously dismissed claim for failure to accommodate. (Doc. 26 at 6.) The Court did not examine the similarity of the disparate-treatment and disparate-impact claims, as that point was not at issue. Finally, while it is true that evidence of disparate impact can be relevant to a claim of disparate treatment, *Pac. Shores Props., LLC v. City of Newport Beach*, 730 F.3d 1142, 1165–66 (9th Cir. 2013), Plaintiff points to no evidence showing that *his* claim for disparate impact, which targets the 1% policy specifically, is based on the same facts as the class claim for disparate treatment. Tolling does not apply here.

Defendant raises a few other arguments against Plaintiff's screening claim. Defendant argues that the claim fails because, separate from any Handbook-based restrictions, Plaintiff was precluded from working based on Dr. Belanger's findings. It also argues that Plaintiff cannot bring a screening claim while proceeding under the regarded-as prong. Finally, it argues that its policy is indisputably job-related and consistent with business necessity. Given the conclusions in this report, the Court finds it unnecessary to

reach these arguments.

* * *

**IT IS RECOMMENDED** that the motion for summary judgment (Doc. 83) be **granted in part** and **denied in part**. The Court recommends that summary judgment be denied as to count one and be granted as to count two.

This recommendation is not immediately appealable to the United States Court of Appeals for the Ninth Circuit. The parties shall have fourteen days from the date of service of this recommendation to file specific written objections with the district court. The parties shall have fourteen days to file responses to any objections. Fed. R. Civ. P. 72(b)(2). No replies may be filed absent prior authorization by the district court. Failure to file timely objections may result in the acceptance of this recommendation without de novo review. *United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003) (en banc).

Dated this 9th day of January, 2023.

Honorable Maria S. Aguilera
United States Magistrate Judge