**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Mark Brasier, | No. CV-21-00065-TUC-JGZ (MSA) |
| Plaintiff, | **ORDER** |
| v. | |
| Union Pacific Railroad Company, | |
| Defendant. | |

Pending before the Court is a Report and Recommendation (R&R) issued by Magistrate Judge Maria S. Aguilera, (Doc. 115), with respect to Defendant Union Pacific Railroad Company's Motion for Summary Judgment on Counts One and Two of Plaintiff Mark Brasier's Complaint. (Doc. 83.) Magistrate Judge Aguilera recommends the Court deny summary judgment as to Count One (disability discrimination) and grant summary judgment as to Count Two (unlawful screening). (Doc. 115 at 5.) Both parties filed objections to the R&R and responses to the other party's objection. (Docs. 120–22, 124.) The Court held oral argument on March 2, 2023.

Upon independent consideration of the record and the parties' briefing and oral argument, the Court will adopt Magistrate Judge Aguilera's R&R in part.

//

//

//

//

I.    **Background**[1]

This action is brought under the Americans with Disabilities Act (ADA). It arises out of Union Pacific's work restrictions, which it imposed on its employee, Mark Brasier, after he underwent brain surgery, effectively dismissing him from service. Much of the underlying dispute centers on Brasier's post-surgery seizure risk while on duty as a conductor and the medical standards Union Pacific used to determine Brasier's work restrictions.

In 2004, Brasier began working for Union Pacific as a brakeman; he eventually became a train conductor. (Docs. 85 ¶ 1; 94 ¶ 1.) The parties dispute whether a conductor operates the train but agree that the conductor plays a part in train operations. (Docs. 85 ¶ 2; 94 ¶ 2.) According to Brasier, the conductor is responsible for the paperwork and ensures that the engineer, who drives the locomotive, follows the applicable travel protocol. (Doc. 94 ¶ 2.) The parties also agree that a conductor is considered the train's "boss" or "point person" and that the work of a conductor is safety-sensitive and requires constant situational awareness. (Docs. 85 ¶¶ 2, 7; 94 ¶¶ 2, 7.) Failing to remain alert could result in a train accident, death, or serious injury as Union Pacific's trains travel through densely populated areas, can weigh over 5,000 tons, and may carry hazardous materials. (Docs. 85 ¶¶ 8–12; 94 ¶¶ 8–12.) To mitigate these risks, Union Pacific employs precautionary protocols and tools, including the use of a three-person train crew and an "alerter bottom." (Docs. 94 ¶¶ 167–68.) An "alerter bottom" sounds an alarm at random intervals and will stop the train automatically if not depressed within a certain period of time. (Doc. 94 ¶ 168.)

In 2006, the Federal Railroad Administration tasked the Railroad Safety Advisory Committee (RSAC) with creating medical standards for the railroad industry. (Doc. 94 ¶¶ 112–14.) For five years, a RSAC working group comprised of railroad unions and major railroad companies (including Union Pacific) attempted to develop industry medical standards. (*Id.*) One of the central issues for the RSAC committee was who would have the

---

[1]  The facts contained in this Background section are undisputed unless otherwise noted.

final say in whether an employee was fit to return to duty. (*Id.* ¶ 117.) The unions wanted a neutral physician to be appointed; the railroad companies disagreed and proposed several alternatives, including making each railroad company's Chief Medical Officer the sole decisionmaker for that company. (*Id.*) The railroad companies also preferred standards with minimal guidance rather than official regulation, which would allow them to avoid the cost of mandatory regulation and largely develop their own standards. (*Id.* ¶ 119.) In 2011, the RSAC working group stopped meeting as stakeholders were unable to reach an agreement. (*Id.* ¶¶ 122–23.)

In 2011, due in part to the absence of comprehensive medical standards, Union Pacific and Dr. Holland, its Chief Medical Officer, re-examined and implemented company-wide medical guidelines and fit-for-duty (FFD) standards based on the Federal Motor Carrier Safety Administration's (FMCSA) 2014 Medical Examiner Handbook. (Docs. 85 ¶¶ 51, 52, 61; 94 ¶¶ 51, 61, 124–26.) Although the FMCSA regulates large commercial trucks and buses, Union Pacific determined the FMCSA Handbook offered the most relevant medical guidelines for its railroad employees. (Docs. 85 ¶¶ 61–62; 94 ¶¶ 61–62.) Implementation of Union Pacific's new FMCSA Handbook-based FFD standards led to the removal of over 7,000 Union Pacific employees. (Doc. 94 ¶ 139.)

In 2015, the FMCSA withdrew the Handbook. (Docs. 85 ¶ 98; 94 ¶ 98.) According to Dr. Morris, Union Pacific's expert, the FMCSA withdrew the Handbook for two reasons: (1) examiners were applying the Handbook guidelines as if they were mandatory; and (2) the FMCSA wanted to update some of the science in the Handbook. (Doc. 94-8 at 11–12.) As to the first reason, Dr. Morris testified that the FMCSA requires in-person exams for commercial driver's license applicants and instructs examiners to take "[e]very individual . . . on a case-by-case basis" because "there may be rare exceptions where you want to deviate from the [Handbook's] guidelines." (Doc. 94-8 at 8, 11.) Thus, according to Dr. Morris, the FMCSA primarily withdrew the Handbook because examiners were "strictly enforcing" the Handbook's guidelines rather than individually assessing each examinee. (*Id.* at 11.) As to the second reason for the Handbook's withdrawal, Dr. Morris testified

1    that some of the underlying science in the Handbook required revisions and dated back to
2    the 1980s. (*Id.* at 16.) Dr. Morris clarified, however, that the Handbook's neurological
3    guidelines, relevant here, were not outdated in any way. (*Id.* at 18.) Still, Dr. Morris
4    testified that the FMCSA went "out of its way" to place a "no longer in use" watermark on
5    the Handbook to indicate to the public that they should treat the Handbook as if it had
6    "been pulled from the Internet." (*Id.* at 12.) The FMCSA has not yet published a new or
7    updated Handbook. (*Id.* at 11.)

8           One year after the FMCSA withdrew the Handbook, Union Pacific applied the
9    Handbook's guidelines in its FFD determination that resulted in Brasier's dismissal. (Docs.
10   85 ¶¶ 75–76, 81, 86; 94 ¶¶ 75–76, 81, 86.) Brasier was diagnosed with a rare brain tumor
11   in 2015. (Docs. 85 ¶ 13; 94 ¶ 13.) He took a medical leave of absence from his job as a
12   conductor and, in December 2015, had an operation, performed by neurosurgeon Dr.
13   Thomas Scully, to remove the tumor. (Docs. 85 ¶¶ 13–14; 94 ¶¶ 13–14.) During the
14   operation, Dr. Scully opened Brasier's dura, the protective cover of the brain beneath the
15   skull, and cauterized his corpus callosum, which connects the two hemispheres of the brain,
16   to prevent bleeding. (Docs. 85 ¶¶ 16–19; 94 ¶¶ 16–19.)

17          In March 2016, clinical neuropsychologist Dr. Belanger completed a
18   neuropsychological evaluation of Brasier and wrote a report summarizing his findings.
19   (Docs. 85 ¶¶ 27–29; 94 ¶¶ 27–29.) In an April 2016 report, Dr. Belanger documented
20   cognitive difficulties which caused him concern over whether Brasier could return to work
21   as a conductor. (Docs. 85 ¶¶ 32–33; 94 ¶¶ 32–33.) However, five months later, in August
22   2016, Dr. Belanger evaluated Brasier again and found that Brasier's cognitive difficulties
23   improved. (Docs. 85 ¶ 37; 94 ¶ 37.) Although the parties dispute whether Brasier provided
24   Dr. Belanger's second report to Union Pacific, (Docs. 85 ¶ 38; 94 ¶ 38), Brasier testified
25   that he sent Dr. Belanger's follow-up report to Union Pacific with the rest of his medical
26   records, (Doc. 95-2 at 20–21.)

27          Following surgery, Union Pacific required Brasier to complete a FFD assessment
28   before he could return to work. (Docs. 85 ¶ 48; 94 ¶ 48.) In August 2016, Union Pacific

- 4 -

requested and received medical records from Brasier. (Docs. 85 ¶¶ 49–50; 94 ¶¶ 49–50.) These records included work releases from Brasier's neurosurgeon Dr. Scully and nurse practitioner Holder. (Doc. 102.) Regarding Brasier's ability to return to work, Dr. Scully stated: "Mark has done spectacularly well from a major surgical intervention. He has no symptoms. He has no seizures. He has been off all medication for a number of months. I see no reason why he cannot return to his pre-morbid employment." (*Id.* at 13.)

In conducting Brasier's FFD assessment, Union Pacific relied on two sections of the withdrawn FMCSA Handbook.[2] (Docs. 85 ¶¶ 71–72; 94 ¶¶ 71–72.) The first section states that individuals who have undergone surgical procedures involving "dural penetration have a risk for subsequent epilepsy . . . . [and] should not be considered eligible for certification." (Doc. 85 ¶ 71.) The second section states: "Severe head injury penetrates the dura and causes a loss of consciousness lasting longer than 24 hours. There is a high risk for unprovoked seizures, and the risk does not diminish over time." (*Id.* ¶ 72.) According to an internal memorandum he authored in 2015, Dr. Holland also relied on the Handbook to implement a sudden-incapacitation standard which deemed employees in a "Safety Critical Position" unfit for duty and an "unacceptable safety risk" if they had a greater than 1% risk of sudden incapacitation each year. (Doc. 102-6.) Based on this memorandum, a seizure is a sudden-incapacitation event. (*Id.* at 2.)

In September 2016, Dr. Charbonneau issued a FFD decision for Brasier which prevented Brasier from performing the job duties of a conductor.[3] (Docs. 85 ¶¶ 75–76, 85–86; 94 ¶¶ 75–76, 85–86.) This decision included six work restrictions: four were permanent based on Brasier's seizure risk and two were temporary based on his cognitive function. (Docs. 85 ¶¶ 78–79; 94 ¶¶ 78–79.) Dr. Holland, as Union Pacific's Chief Medical Officer, reviewed Dr. Charbonneau's conclusion and agreed that Brasier had an unacceptable risk of seizure. (Docs. 85 ¶ 81; 94 ¶ 81.) No physician with specialized expertise in neurology

---

[2]  Brasier disputes that the Handbook includes these statements, asserting the FMCSA no longer endorses the Handbook's use. (Doc. 94 ¶¶ 71–72.)

[3]  The parties dispute whether Dr. Holland was the final decision maker for the FFD determination. (Doc. 94 ¶ 78.)

or brain surgery participated in this FFD assessment. (Doc. 94 ¶¶ 208–09, 223–24.) Dr. Charbonneau testified that he suggested seeking an outside opinion but Dr. Holland "felt that [Brasier's case] was straightforward enough . . . that [Union Pacific] could go forward without an external review." (Doc. 95 at 20–21.) Dr. Holland testified that Brasier's case was straightforward because the Handbook stated anyone who experienced dural penetration had an increased seizure risk. (Doc. 95-6 at 38.) The FFD decision included notes by Dr. Charbonneau which stated in part:

> [Brasier] has been released for Full Duty. According[]to peer-reviewed medical guidelines, [Brasier] has an unacceptably high,[]permanently increased risk of seizures following the removal of a brain[]tumor which required dural penetration for the removal. There is also the[]unresolved issue of persistent neuropsychological deficits. . . .
>
> According to FMCSA[]Guidelines, [Brasier] needs sudden incapacitation restrictions,[]permanently.

(Doc. 92-6 at 3–4.) Dr. Holland also noted in the FFD decision:

> Brasier has an unacceptable risk for future seizures because: (1) he has[]had [an] intravertebral tumor and (2) he has had neurosurgery of the brain that involves penetration of the dura. Both these conditions pose[]unacceptable risks for future seizures, even if a seizure has not[]occurred. This is consistent with the medical scientific literature, and[]with the guidelines of the FMCSA (which are useful as a reference, even though[]these do not directly apply to this employee who is a Conductor).[4]

(Doc. 92-6 at 2.)

Prior to Union Pacific's September 2016 FFD decision that removed Brasier from service, a nationwide class-action was filed against Union Pacific alleging ADA claims for disparate treatment, disparate impact, and unlawful medical inquiries. (Doc. 16-1.) A central focus of this class-action was the 1% sudden-incapacitation standard Union Pacific implemented based on the Handbook. *See Harris v. Union Pac. R.R. Co.*, 329 F.R.D. 616, 620, 624, 628 (D. Neb. 2019), *rev'd*, 953 F.3d 1030 (8th Cir. 2020). The class-action was

---

[4]   Dr. Holland testified that he incorrectly wrote in this note that Brasier had an "intravertebral tumor," a tumor in the spinal column. (Doc. 85-6 at 38.) According to Dr. Holland's testimony, Brasier had an "intracerebral tumor." (*Id.*)

1    decertified in March 2020. (Docs. 85 ¶ 106; 94 ¶ 106.) In April 2020, Brasier filed an

2    EEOC charge of discrimination. (Docs. 85 ¶ 107; 94 ¶ 107.)

3        In February 2021, Brasier filed this action, alleging three violations of the ADA:

4    disability discrimination, unlawful screening, and failure to accommodate. (Docs. 1, 13.)

5    In a November 24, 2021 Order, the Court dismissed the failure-to-accommodate claim.

6    (Doc. 40.) On June 28, 2022, Union Pacific filed a Motion for Summary Judgment on

7    Brasier's two remaining claims. (Doc. 83.) The parties fully briefed the Motion before

8    Magistrate Judge Aguilera, who was referred this case pursuant to 28 U.S.C. § 636(b)(1)

9    and LR Civ. 72.1 and 72.2. (Docs. 8, 93, 107.) On January 9, 2023, Magistrate Judge

10   Aguilera issued the underlying R&R, recommending the Court deny summary judgment

11   as to disability discrimination (Count One) and grant summary judgment as to unlawful

12   screening (Count Two). (Doc. 115 at 5.)

13   **II.    Summary Judgment Standard**

14       When reviewing a magistrate judge's R&R, this Court "may accept, reject, or

15   modify, in whole or in part the findings or recommendations made by the magistrate

16   judge." 28 U.S.C. § 636(b)(1). "[T]he district judge must review the magistrate judge's

17   findings and recommendations de novo *if objection is made*, but not otherwise." *United

18   States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003). District courts are not required

19   to conduct "any review at all . . . of any issue that is not the subject of an objection." *Thomas

20   v. Arn*, 474 U.S. 140, 149 (1985); *see also* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

21   Further, a party is not entitled as of right to de novo review of evidence or arguments which

22   are raised for the first time in an objection to the report and recommendation, and the

23   Court's decision to consider newly raised arguments is discretionary. *Brown v. Roe*, 279

24   F.3d 742, 744 (9th Cir. 2002).

25       Summary judgment will be granted when the movant has shown "that there is no

26   genuine dispute as to any material fact and the movant is entitled to judgment as a matter

27   of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A dispute

28   is "genuine" if there is sufficient evidence for a reasonable jury to return a verdict in favor

of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it might affect the outcome of the suit under the governing law. *Id.* There is no genuine issue as to any material fact when a party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex Corp.*, 477 U.S. at 322–23

At summary judgment, the court must not weigh the evidence but determine whether there is a genuine issue of material fact for trial. *Anderson*, 477 U.S. at 294. A court presented with a motion for summary judgment must view the facts and draw reasonable inferences in the light most favorable to the nonmoving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007).

## III.    Discussion

The Court finds that summary judgment cannot be granted on this record.

### A.    Disability Discrimination (Count One)

In Count One, Brasier alleges Union Pacific discriminated against him in violation of the ADA by issuing work restrictions which effectively dismissed him based on his disability. (Doc. 13 ¶¶ 36–41.) To establish an ADA violation, Brasier must show (1) he was disabled under the ADA; (2) he was qualified for his position as a train conductor; and (3) Union Pacific discriminated against him because of his disability. *See EEOC v. BNSF Ry. Co.*, 902 F.3d 916, 922 (9th Cir. 2018). If these requirements are met, Union Pacific may still avoid liability for discrimination if it establishes Brasier was a "direct threat." *See* 42 U.S.C. § 12113(b).

The Magistrate Judge's recommendation to deny summary judgment on Count One rests on three central findings. First, there is a material dispute as to whether Union Pacific regarded Brasier as disabled and dismissed him out of fear that his brain tumor, and resulting surgery, caused cognitive issues and an increased seizure risk. (Doc. 115 at 6–10.) Second, there is a material dispute as to whether Brasier was qualified for his job based on conflicting medical evidence. (*Id.* at 10–14.) Third, there is a material dispute as to whether Brasier was a direct threat because Brasier proffered evidence which could

1   establish that Union Pacific's FFD assessment failed to comply with ADA regulations. (*Id.*
2   at 14–19.)

3          In its Objection, Union Pacific argues (1) Brasier was not a qualified individual; and
4   (2) the Magistrate Judge improperly analyzed the direct-threat defense. (Doc. 121 at 3, 9.)

5                  **1.      Brasier's Qualifications**

6          The Magistrate Judge determined there is a genuine issue of material fact as to
7   whether Brasier was a qualified individual based on conflicting medical evidence regarding
8   whether Brasier could perform the essential functions of his job. (Doc. 115 at 10–12.)
9   Neuropsychologist Dr. Belanger's April 2016 report indicates that Brasier suffered from
10  cognitive issues which could interfere with his work as a conductor. (*Id.*) However,
11  Brasier's brain surgeon Dr. Scully, neurologist Dr. Sullivan, and nurse practitioner Holder
12  eventually cleared Brasier to work without any restrictions. (*Id.*) Additionally, the
13  Magistrate Judge identified a factual dispute as to whether Union Pacific received Dr.
14  Belanger's August 2016 follow-up report, which stated Brasier's cognitive issues
15  improved, and, according to Brasier, raised no concerns about him returning to work.
16  (Docs. 85 ¶¶ 37–38; 94 ¶¶ 37–38, 193, 196; 115 at 13.)

17         Union Pacific contends Dr. Belanger's April 2016 report conclusively established
18  Brasier was not qualified. (Doc. 121 at 10.) Union Pacific also argues the Court should not
19  consider Dr. Belanger's August 2016 follow-up report because a reasonable jury could not
20  conclude, based on Brasier's self-serving testimony, that Union Pacific received and
21  reviewed it as part of the FFD assessment. (*Id.* at 11.) The Court is not persuaded by Union
22  Pacific's objections.

23         First, Dr. Belanger's April 2016 report does not conclusively establish whether
24  Brasier was qualified. Union Pacific argues that neuropsychologist Dr. Belanger evaluated
25  Brasier's cognitive function, which Dr. Scully, Dr. Sullivan, and nurse practitioner Holder
26  were not trained to evaluate. (Doc. 121 at 10.) Brasier, however, points to other evidence
27  that presents a factual dispute as to his qualification to work in August 2016, including Dr.
28  Scully's medical note indicating Brasier had "no symptoms," as well as evidence showing

1    Dr. Scully, Dr. Sullivan, and nurse practitioner Holder cleared him to work without

2    restrictions in August 2016. (Docs. 94 ¶¶ 197–98, 205.) Union Pacific assessed Brasier's

3    qualification to work in August and September 2016. (*See* Docs. 85 ¶¶ 76, 82; 94 ¶¶ 76,

4    82.) A reasonable jury could conclude that, at the time of the assessment, the August 2016

5    notes and work releases better reflected Brasier's current qualifications than Dr. Belanger's

6    April 2016 report, which rested on five-month-old observations. Dr. Scully is also a board-

7    certified neurosurgeon with two decades of experience. (Doc. 94 ¶ 171–72.) Although Dr.

8    Scully is not a psychologist, the fields of neurosurgery and cognitive function are

9    nevertheless closely related. A reasonable jury could infer, based on Dr. Scully's training

10   and experience, that Dr. Scully finding Brasier had "no symptoms" meant Brasier

11   displayed no signs of cognitive impairment.[5]

12          Second, Brasier's testimony raises as a triable dispute whether Union Pacific

13   received Dr. Belanger's August 2016 follow-up report. (Docs. 85 ¶ 38; 94 ¶ 38.) A jury

14   may very well disbelieve Brasier's testimony that the follow-up report was in the

15   documentation he sent to Union Pacific. At summary judgment, however, "[t]he evidence

16   of the non-movant is to be believed, and all justifiable inferences are to be drawn in his

17   favor." *See Anderson*, 477 U.S. at 255; *see also Leslie v. Grupo ICA*, 198 F.3d 1152, 1158

18   (9th Cir. 1999) (a court cannot disregard sworn testimony at summary judgment on the

19   grounds that it is implausible and no reasonable jury would believe it; the non-movant's

20   sworn testimony is direct evidence that must be accepted as true). Brasier's testimony is

21   therefore not a "scintilla of evidence" as suggested by Union Pacific. (*See* Doc. 121 at 11.)

22   A reasonable jury could find Brasier credible and infer that Union Pacific received the

23   follow-up report but did not include it in the evaluation of Brasier's work restrictions. *See*

24   *Leslie*, 198 F.3d at 1157–59. The Court also cannot discard Brasier's testimony on an issue

25   such as sending medical records, where the evidence is often inconclusive and the sender's

26   testimony is hardly implausible. *Cf. Schikore v. BankAmerica Supplemental Ret. Plan*, 269

---

27
28   [5] Dr. Scully also testified in his deposition that, when he saw Brasier at some point between
     April and August 2016, "[Brasier] had significant improvement in his everyday activities,
     [and] his cognitive functioning." (Doc. 85-4 at 21.)

1    F.3d 956, 963 (9th Cir. 2001) (receipt and non-receipt often rest on unproven assertions).[6]

2        Summary judgment on Brasier's work qualifications is also precluded by the

3    parties' dispute on the essential functions of a conductor. Brasier argues conductors are the

4    train "boss," manage paperwork, and ensure the engineer, who drives the train, follows the

5    applicable travel protocol. (Doc. 94 ¶ 2.) Union Pacific, relying in part on a job description,

6    asserts conductors are responsible for train operations and may, at times, operate the train.

7    (Doc. 85 ¶¶ 2–3; Oral Argument.) This evidentiary conflict is best left for the finder of fact.

8    *See Cripe v. City of San Jose*, 261 F.3d 877, 888–89 (9th Cir. 2001) (whether making a

9    forcible arrest was an essential function for all specialized law-enforcement assignments

10   was a disputed fact despite the employer's job description); *see also Rohr v. Salt River

11   Project Agric. Imp. & Power Dist.*, 555 F.3d 850, 864 (9th Cir. 2009).

12                **2.      Direct-Threat Defense**

13       An employer may avoid liability for discrimination by establishing its employee

14   posed "a direct threat to the health or safety of other individuals in the workplace." 42

15   U.S.C. § 12113. "Direct Threat means a significant risk of substantial harm to the health

16   or safety of the individual or others that cannot be eliminated or reduced by reasonable

17   accommodation." 29 C.F.R. § 1630.2(r). A direct-threat determination must be based on

18   an "individualized assessment of the individual's present ability to safely perform the

19   essential functions of the job." *Id.* This assessment must be "based on a reasonable medical

20   judgment that relies on the most current medical knowledge and/or on the best available

21   objective evidence." *Id.* Factors to be considered in determining whether an employee is a

22

23   _____

     [6]  Union Pacific relies on *Sorrentino v. IRS*, 383 F.3d 1187 (10th Cir. 2004), to argue that
24   Brasier's testimony that he believes he sent the August 2016 follow-up report is insufficient
     evidence to establish a factual dispute. (Doc. 121 at 11.) The Tenth Circuit's holding in
25   *Sorrentino*, however, conflicts with Ninth Circuit precedent. *See id.* at 1197–99 (10th Cir.
     2004) (Seymour, J., dissenting) (contrasting Ninth and Tenth Circuit precedent); *see also
26   Anderson v. United States*, 966 F.2d 487, 491 (9th Cir. 1992) ("Under the common law
     mailbox rule, proper and timely mailing of a document raises a rebuttable presumption that
27   it is received by the addressee."); *Schikore*, 269 F.3d at 963 ("[T]he presumption of receipt
     established by the mailbox rule [is applied] precisely to avoid the type of swearing contest
28   in which the parties are presently involved.").

direct threat include the following:

> (1) The duration of the risk;

> (2) The nature and severity of the potential harm;

> (3) The likelihood that the potential harm will occur; and

> (4) The imminence of the potential harm.

*Id.* Union Pacific bears the burden of proving its affirmative defense that Brasier posed a direct threat. *Hutton v. Elf Atochem N. Am., Inc.*, 273 F.3d 884, 893 (9th Cir. 2001).

The Magistrate Judge determined there was a genuine issue of material fact as to whether Brasier was a direct threat, concluding a reasonable jury could find that Union Pacific issued objectively unreasonable work restrictions and neither relied on the most current medical knowledge when assessing Brasier nor completed an individualized assessment. (Doc. 115 at 16–17.) In considering the § 1630.2(r) factors, the Magistrate Judge also found a genuine issue of material fact as to at least factors three and four. (*Id.* at 17.)

In its Objection, Union Pacific challenges the Magistrate Judge's findings, arguing the Magistrate Judge (1) improperly framed the direct-threat defense; (2) improperly afforded equal weight to each of the § 1630.2(r) factors; and (3) improperly considered conclusory expert opinions as raising factual disputes. (Doc. 121 at 4–6.)

### i.   The Standard for Evaluating Medical Decisions

Union Pacific argues that, in analyzing the direct-threat defense, the Magistrate Judge improperly conflated "a reasonable medical decision with an infallible one." (Doc. 121 at 3; *see* Doc. 115 at 16–19.) This arguments rests largely on Union Pacific's contention that it need only have reached a reasonable decision in assessing Brasier. (Doc. 121 at 3–5.) If the Court denies summary judgment based on Brasier's expert's criticism of the assessment, Union Pacific argues the Court would essentially be requiring Union Pacific to prove its decision infallible—an admittedly impossible task. (*See id.* at 2–3.) Union Pacific's argument creates a false-dilemma fallacy: either Union Pacific must show its decision was reasonable or Union Pacific must show its decision was infallible and

immune from all criticism. Neither absolute is true under the ADA regulations. Although Union Pacific need not show its assessment of Brasier was infallible, it cannot prevail by merely showing it acted reasonably. *See* 29 C.F.R. § 1630.2(r). Rather, Union Pacific must show its assessment was reasonable as well as individualized and based on the best and most current medical evidence. *See id.*

Under § 1630.2(r), a "facially reasonable" assessment is not a "legally sufficient individualized assessment." *Echazabal v. Chevron USA, Inc.*, 336 F.3d 1023, 1028 (9th Cir. 2003). In *Echazabal*, an employer rescinded an applicant's job offer after lab tests from the applicant's physical exam showed that his liver was releasing a high level of enzymes. *Id.* at 1026. The employer reasoned that the job it offered the applicant could damage his liver because the job duties exposed him to chemicals. *Id.* In making this decision, the employer relied on the opinions of doctors who neither specialized in liver disease nor specifically analyzed the chemicals involved, the levels at which those chemicals posed a risk to the applicant, or how the applicant's risk compared to that of a healthy individual. *Id.* at 1028–30. The Ninth Circuit held that the question of whether the employer completed an individualized assessment presented a factual dispute. *Id.* at 1030. In so doing, the Ninth Circuit rejected the employer's argument that its assessment was "objectively reasonable under the circumstances," explaining the ADA required the employer "to do more than consider generalized statements of potential harm." *Id.* at 1030, 1034.

As discussed by the Magistrate Judge, Brasier raises genuine disputes of material fact as to whether Union Pacific conducted the required individualized assessment. (*See* Doc. 115 at 16–17.) Brasier points out that no physicians with expertise in neurology or brain surgery participated in the FFD assessment because, according to Dr. Charbonneau's testimony, Dr. Holland believed Brasier's case was "straightforward." (Doc. 94 ¶¶ 208–09, 211; 223–24; 95 at 20–21.) Dr. Holland in turn testified that Brasier's case was straightforward because the Handbook stated anyone who experienced dural penetration had an increased seizure risk. (Doc. 95-6 at 38.) Dr. Holland and Dr. Charbonneau's written

notes in the FFD decision also reflect their reliance on the Handbook even though its guidelines were intended for commercial vehicle drivers rather than train conductors.[7] (Doc. 92-6 a 2–4.) And absent from both Dr. Holland and Dr. Charbonneau's written notes is an analysis of Brasier's specific risk of seizure or the potential harm that could occur if he experienced a seizure while on duty. (*See id.*)

Based on these facts, a reasonable jury could conclude that Union Pacific's assessment of Brasier was not sufficiently individualized. *See Echazabal*, 336 F.3d at 1030. Like the employer in *Echazabal* that relied on the opinions of doctors with no specialized expertise in liver disease, Union Pacific relied on Dr. Charbonneau and Dr. Holland who lacked specialized expertise in neurology and brain surgery. (Doc. 94 ¶¶ 208–09, 223–24.) The employer in *Echazabal* also relied on generalized statements of potential harm. Similarly, Brasier proffers evidence which could establish that Union Pacific relied exclusively on the Handbook's generalized statement that all individuals with a penetrated dura had a permanently increased seizure risk.[8] And just as the employer's assessment in *Echazabal* lacked a specific analysis of the risk and potential harm of the applicant's chemical exposure, here also Union Pacific's assessment lacked a specific analysis of the risk and potential harm of Brasier having a seizure while on duty as a conductor. (*See* Doc. 92-6 at 2–4.)

Union Pacific argues that, unlike the employer in *Echazabal*, it relied on government-endorsed guidelines and peer-reviewed medical studies. (Doc. 107 at 13.) However, as discussed below, whether the government-endorsed Handbook reflects the

---

[7]  For instance, Dr. Holland's note states: "Brasier has an unacceptable risk for future seizures," a conclusion consistent with the "guidelines of FMCSA . . . even though [the Handbook's guidelines] do no[t] directly apply to this employee who is a Conductor." (Doc. 92-6 at 2.)

[8]  At Oral Argument, Union Pacific asserted Dr. Charbonneau did not rely entirely on the Handbook but also relied on Brasier's post-surgery bleeding and cauterization of the corpus callosum as other factors that increase seizure risk. Union Pacific's FFD decision, however, includes no comments on Brasier's post-surgery bleeding or cauterization. (*See* Doc. 92-6.) Brasier also asserts Dr. Charbonneau did not review any relevant evidence-based scientific articles at the time of the assessment. (Doc. 94 ¶ 217.)

best and most current medical knowledge is disputed. Brasier also points out that Dr. Holland cited to medical studies in his decision but when deposed could not identify any of them. (Doc. 94 ¶ 222; 95-6 at 39.) More importantly, even assuming the Handbook was the best and most current medical knowledge, Union Pacific must still complete an "individualized assessment" of Brasier's ability to safely perform his job. *See* 29 C.F.R. § 1630.2(r). Reliance on the Handbook does not displace that responsibility. Indeed, Union Pacific's expert testified that the FMCSA withdrew its Handbook for this very reason: medical examiners were treating the Handbook's guidelines as mandatory rather than using them to evaluate individuals on a case-by-case basis. (Doc. 94-8 at 11.)

What is more, Brasier asserts that neither Dr. Charbonneau nor Dr. Holland analyzed the duration of risk posed by Brasier or the nature, severity, likelihood, or imminence of potential harm that may occur should Brasier experience a seizure while on duty.[9] (Doc. 93 at 26–27.) An undisputedly individualized inquiry may have included personally examining Brasier, seeking an external opinion from a specialist, analyzing Brasier's specific seizure risk, or evaluating the potential harm of a conductor experiencing a seizure. *See Echazabal*, 336 F.3d at 1028–34; 29 C.F.R. § 1630.2(r). Taken together, a reasonable jury could conclude that Union Pacific avoided this more challenging individualized inquiry in favor of relying on the Handbook's uniform guidelines.

There also remain genuine disputes of material fact as to whether Union Pacific's assessment was based on the *most* current medical knowledge and the *best* available objective evidence. *See* 29 C.F.R. § 1630.2(r). The parties dispute whether the FMCSA's Handbook, which Union Pacific relied on in deciding whether Brasier was a direct threat, reflected the most current medical knowledge and best available objective evidence. (Docs. 85 ¶¶ 63–65, 71–73; 94 ¶¶ 63–65, 71–73.) Although Dr. Morris testified that he does not believe the Handbook includes outdated neurological science, he also testified that one of

---

[9]   In concluding Brasier required sudden-incapacitation work restrictions, Dr. Holland stated: "Brasier has an unacceptable risk for future seizures because: (1) he has[]had [an] intravertebral tumor and (2) he has had neurosurgery of the brain that involves penetration of the dura. Both these conditions pose[]unacceptable risks for future seizures, even if a seizure has not[]occurred." (Doc. 92-6 at 2.)

1    the reasons the FMCSA withdrew the Handbook was because it needed to update old

2    science, some of which dated back to the 1980s. (Doc. 94-8 at 16, 18.) Brasier also asserts

3    the FMCSA removed the Handbook from its website in 2015 and no longer endorses its

4    use. (Doc. 94 ¶ 63.) And Dr. Morris testified that the FMCSA went "out of its way to

5    indicate to individuals that the handbook is not in use anymore." (Doc. 94-8 at 12.) A jury

6    could reasonably infer from Dr. Morris's testimony and the circumstances of the

7    Handbook's sudden withdrawal that the Handbook was no longer the most current and best

8    available evidence at the time Union Pacific assessed Brasier.

9                    ii.        Section 1630.2(r) Factors

10       Union Pacific argues the Magistrate Judge should have afforded greater weight to

11   the second § 1630.2(r) factor: nature and severity of the potential harm. (Doc. 121 at 5.)

12   According to Union Pacific, Brasier suffering from a seizure while responsible for a 5,000-

13   ton train carrying hazardous material could cause "catastrophic harms." (*Id.* at 6.) This

14   potential for catastrophe, however, is disputed. As a conductor, Brasier contends he does

15   not operate the train but manages paperwork and ensures the engineer, who does operate

16   the train, follows correct protocols. (Docs. 94 ¶¶ 1–3, 161–68; 124 at 4–5.) Brasier also

17   contends there are multiple safeguards, including the use of a three-person train crew and

18   "alerter bottoms," which prevent catastrophic harms should one crew member suddenly

19   become incapacitated. (Docs. 94 ¶¶ 161–68; 124 at 4–5.) In any event, this evidentiary

20   conflict is best left for the jury. *Cf. Cripe*, 261 F.3d at 888–89 (disputed facts related to

21   employee's ability to safely perform essential functions of job precluded summary

22   judgment); *Rohr*, 555 F.3d at 864 (same).

23       Union Pacific contends that *Hutton v. Elf Atochem North America, Inc.*, 273 F.3d

24   884 (9th Cir. 2001), requires the Court to give more weight to the nature and severity of

25   the potential harm that could occur should Brasier have a seizure while on duty. (Doc. 121

26   at 5; Oral Argument.) In *Hutton*, the Ninth Circuit held that a diabetic employee, who had

27   a seizure and lost consciousness while on duty, was a "walking time bomb" because he

28   personally managed the pumping of chlorine and its conversion from gas into liquid form.

1    *Id.* at 886–87, 894. If the employee suddenly became incapacitated, he would not have

2    been able to turn off the pump and chlorine could dangerously overflow onto the floor. *Id.*

3    at 894. Despite multiple safeguards that would prevent such an accident, the Ninth Circuit

4    concluded the employee was a direct threat. *Id.* The Ninth Circuit, however, rested its

5    holding not only on the significant scale of potential harm but several other pertinent facts:

6    the job required the employee to work alone, he had already lost consciousness once, he

7    demonstrated difficulty monitoring his diabetes at work, and he had an "erratic medical

8    history." *Id.* Unlike the employee in *Hutton*, Brasier did not work alone; he never had a

9    seizure; and his neurosurgeon, neurologist, neuropsychologist, and nurse practitioner

10   expressed no concerns about his medical history or ability to return to work safely. (Doc.

11   94 ¶¶ 167, 179, 196, 198, 205.) Even under *Hutton*, Union Pacific has not proven its direct-

12   threat defense as a matter of law.

13                           **iii.       Expert Opinions**

14         The Magistrate Judge did not rest her findings on conclusory expert opinions. As

15   Union Pacific points out, Brasier's experts Dr. Devereaux and Dr. Scully fail to support

16   their opinions with any specific data or studies. (*See* Docs. 85-6 at 10; 85-4 at 15.) Indeed,

17   expert opinions do not automatically raise a genuine issue of material fact, particularly

18   opinions unsupported by sufficient facts. *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421,

19   1440 (9th Cir. 1995). Brasier, however, also relies on other evidence to dispute Union

20   Pacific's medical evidence, including evidence that FMCSA considers the Handbook's

21   underlying science outdated and the Handbook applied to the trucking industry rather than

22   the railroad industry. (Docs. 94 ¶ 63; 124 at 5–6.) Moreover, when considering a motion

23   for summary judgment, the Court must view the facts and draw reasonable inferences in

24   the light most favorable to Brasier. *See Scott*, 550 U.S. at 378.

25         For all the reasons set forth above, the Court will overrule Union Pacific's

26   Objection, adopt the Magistrate Judge's R&R as to Count One, and deny Union Pacific's

27   Motion for Summary Judgment as to Count One.

28   //

1

**B.      Unlawful Screening (Count Two)**

2      In Count Two, Brasier alleges Union Pacific screened him in violation of the ADA

3  by finding him unqualified for work under its 1% sudden-incapacitation standard. (Docs.

4  13 ¶¶ 42–48; 93 at 23; 120 at 2–3.) The ADA prohibits employers from "using qualification

5  standards . . . that screen out or tend to screen out an individual with a disability." 42 U.S.C.

6  § 12112(b)(6). Under the business-necessity defense, an employer may screen out

7  individuals with a disability if the screening is "shown to be job-related for the position in

8  question and is consistent with business necessity." *Id.* § 12112(b)(6).

9      Under the ADA, plaintiffs may allege discrimination under the theories of disparate

10  treatment and disparate impact. *Raytheon Co. v. Hernandez*, 540 U.S. 44, 53 (2003). The

11  disparate-treatment theory requires a plaintiff to show that his employer intentionally

12  discriminated against him based on his disability. *See id.* at 52–53. Under a disparate-

13  impact theory, a plaintiff must show a neutral employment practice fell more harshly on

14  persons with disabilities. *See id.* In essence, the disparate-impact theory is a doctrinal

15  substitute for preventing unprovable acts of intentional discrimination hidden behind

16  facially neutral policies. *See EEOC v. Joe's Stone Crab, Inc.*, 220 F.3d 1263, 1274 (11th

17  Cir. 2000).

18      Plaintiffs may allege unlawful screening under either theory. *See, e.g.*, *Rohr*, 555

19  F.3d at 862 (employee alleged employer's qualification standard was facially

20  discriminatory); *Lopez v. Pac. Mar. Ass'n*, 657 F.3d 762, 766 (9th Cir. 2011) (applicant

21  alleged employer's qualification standard was facially neutral but had disparate impact). A

22  plaintiff can establish his initial burden under either theory by showing the employer's

23  qualification standard screened him out based on his disability. *See* 42 U.S.C. §

24  12112(b)(6); *Rohr*, 555 F.3d at 863 ("[B]ecause the test tended to screen out an individual

25  with diabetes-related high blood pressure, [the employer] has not established that it is

26  entitled to summary judgment."); *Gonzales v. City of New Braunfels*, 176 F.3d 834, 839

27  n.26 (5th Cir. 1999) ("In the ADA context, a plaintiff may satisfy the second prong of his

28  prima facie case by demonstrating an adverse impact on himself rather than on an entire

group.").

Because a plaintiff may prove his prima facie case for disparate impact by establishing he was screened out in violation of § 12112(b)(6), the ADA does not require that a plaintiff also present supporting statistical evidence. *See Williams v. ABM Parking Servs. Inc.*, 296 F. Supp. 3d 779, 789–90 (E.D. Va. 2017) ("[A]n individual advancing an ADA disparate impact claim need not present statistical evidence if he or she can show that a job qualification screens out the plaintiff on the basis of his or her disability."); *see also Gonzales*, 176 F.3d at 839 n.26; *Leskovisek v. Ill. Dep't of Transp.*, 506 F. Supp. 3d 553, 569 (C.D. Ill. 2020); *EEOC v. Dolgencorp, LLC*, No. 2:17-CV-01649-MHH, 2022 WL 2959569, at *8 (N.D. Ala. July 26, 2022). The absence of a statistical-evidence requirement reflects not only the nuanced statutory language of § 12112(b)(6), *see Leskovisek*, 506 F. Supp. 3d at 567–69, but the nearly impossible task of collecting statistical data on persons with disabilities.[10]

The Magistrate Judge recommended the Court grant summary judgment on Brasier's screening claim for three reasons: (1) Brasier failed to present evidence showing Union Pacific applied its 1% sudden-incapacitation rule to him; (2) Brasier failed to prove his prima facie case for unlawful screening; and (3) Brasier failed to timely raise his disparate-impact claim. (Doc. 115 at 20–21.). The Court disagrees and first addresses the

---

[10]   The EEOC's ADA Technical Assistance Manual emphasizes the impracticality of requiring statistical comparisons in ADA disparate-impact claims:

> It is not necessary to make statistical comparisons between a group of people with disabilities and people who are not disabled to show that a person with a disability is screened out by a selection standard. Disabilities vary so much that it is difficult, if not impossible, to make general determinations about the effect of various standards, criteria and procedures on "people with disabilities." Often, there may be little or no statistical data to measure the impact of a procedure on any "class" of people with a particular disability compared to people without disabilities. As with other determinations under the ADA, the exclusionary effect of a selection procedure usually must be looked at in relation to a particular individual who has particular limitations caused by a disability.

EEOC, *A Technical Assistance Manual on the Employment Provisions (Title I) of the Americans with Disabilities Act* § IV-4.3 (1992), https://bit.ly/2ZbsY5s.

1   Magistrate Judge's reasoning before discussing Union Pacific's remaining arguments.

2   **1.    Arguments Addressed in the R&R**

3   **i.    Application of the 1% Rule**

4   Union Pacific contends, and the Magistrate Judge agreed, that Brasier confuses the
5   existence of the 1% rule with its application to him. (Docs. 107 at 9 n.3; 115 at 20.)
6   However, even though Brasier appears to concede there is no direct evidence that Union
7   Pacific applied the 1% rule to him,[11] a factfinder may reasonably infer from the
8   circumstances that Dr. Holland applied the standard to Brasier. The general rule in civil
9   litigation that parties may rely on direct or circumstantial evidence also applies in
10  discrimination claims. *See Desert Palace, Inc. v. Costa*, 539 U.S. 90, 99 (2003)
11  ("Circumstantial evidence is not only sufficient, but may also be more certain, satisfying
12  and persuasive than direct evidence."). Dr. Holland knew of the 1% rule because he
13  implemented it as Union Pacific's Chief Medical Officer. (Doc. 95-6 at 24–25.) Under this
14  qualification standard, employees with a greater than 1% risk of sudden incapacitation
15  require work restrictions because they are an "unacceptable safety risk." (Doc. 102-6 at 3.)
16  And there is evidence in the record showing Dr. Holland determined that Brasier should
17  receive the sudden-incapacitation work restrictions because his potential for seizures posed
18  "an unacceptable risk." (Doc. 92-6 at 2.) From these circumstances, a factfinder could
19  reasonably infer that Dr. Holland found Brasier an unacceptable safety risk because the
20  chance of him experiencing a seizure was greater than 1%. Whether Union Pacific applied
21  the 1% rule to Brasier on the basis of his disability is thus a genuine dispute of material
22  fact that precludes summary judgment.

23  **ii.    Unlawful Screening**

24  Brasier presented sufficient evidence to establish his prima facie case of unlawful
25  screening under either a theory of disparate treatment or disparate impact. The Magistrate
26  Judge determined, after analyzing the unlawful-screening claim under a disparate-impact

27

28  [11]  *See* Doc. 94 ¶ 220 ("Dr. Charbonneau never concluded that Brasier had a greater than 1% risk of sudden incapacitation, as required by Dr. Holland's guidelines.").

theory, that Brasier failed to establish his prima facie case because he presented no evidence showing Union Pacific's 1% rule disproportionately impacted a group of people with a disability. (Doc. 115 at 20–21.) Under either a disparate-treatment or disparate-impact theory, Brasier may prove his prima facie case for unlawful screening by establishing that Union Pacific's 1% rule screened him out on the basis of his disability. *See Rohr*, 555 F.3d at 863; *Gonzales*, 176 F.3d at 839 n.26. Brasier need not prove his prima facie case with evidence, statistical or otherwise, showing a larger impact on a group of people with a disability. As discussed above, Brasier raises a genuine dispute of material fact as to whether Union Pacific screened him out on the basis of his disability using the 1% rule. Brasier has therefore established his prima facie case for unlawful screening under the theories of disparate treatment and disparate impact.

### iii.      Tolling

The Magistrate Judge also found that Brasier's unlawful-screening claim, to the extent he alleges it under a disparate-impact theory, is untimely and barred by the statute of limitations. (Doc. 115 at 21.) In *American Pipe*, the Supreme Court held that the filing of a class-action suit tolls the statute of limitations for all purported class members who make timely motions to intervene after a district court has denied class certification. *Am. Pipe & Const. Co. v. Utah*, 414 U.S. 538, 552–56 (1974). This holding was extended by the Supreme Court in *Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345, 352–54 (1983). After *Crown, Cork*, a class-action complaint tolls the statute of limitations not just for purported class members who timely intervene but also for any purported class members who timely file individual suits. *Id.* at 353–54.

The Supreme Court has noted that *American Pipe* tolling is consistent with the purpose of the statute of limitations: placing defendants on notice of adverse claims and preventing plaintiffs from sleeping on their rights. *Crown, Cork*, 462 U.S. at 352; *Del. State Coll. v. Ricks*, 449 U.S. 250, 256–57 (1980). The initial class-action complaint "notifies the defendants not only of the substantive claims being brought against them, but also of the number and generic identities of the potential plaintiffs who may participate in the

1    judgment." *Am. Pipe*, 414 U.S. at 555. Defendants will be aware of the "need to preserve

2    evidence and witnesses" and will not face "unfair surprise." *Crown, Cork*, 462 U.S. at 353.

3    And under *American Pipe* tolling, plaintiffs are not sleeping on their rights because "Rule

4    23 both permits and encourages class members to rely on the named plaintiffs to press their

5    claims." *Crown, Cork*, 462 U.S. at 352–53.

6        *American Pipe* tolling, however, is not indefinite. The Supreme Court has held that

7    it ends upon denial of class certification. *Crown, Cork*, 462 U.S. at 353. Union Pacific

8    requests the Court take this holding a step further and conclude that *American Pipe* tolling

9    also ends when named plaintiffs abandon an already pled claim when filing a motion for

10   class certification. (Doc. 84 at 7.) Under this reasoning, which the Magistrate Judge found

11   persuasive, Brasier's unlawful-screening disparate-impact claim would be untimely. (*See*

12   Docs. 84 at 6–9; 115 at 21–22.)

13       Relevant here, six representative plaintiffs filed a class-action complaint against

14   Union Pacific in February 2016.[12] (Doc. 16-1.) This complaint asserted on behalf of the

15   class ADA claims for (1) disparate treatment; (2) disparate impact; and (3) unlawful

16   medical inquiries. (*Id.* at 21–24.) In September 2016, the allegations giving rise to this

17   action occurred when Union Pacific issued work restrictions for Brasier. (*See* Doc. 13 ¶¶

18   25–26.) Union Pacific concedes that the underlying class action tolled Brasier's claims for

19   the next two years. (Doc. 84 at 8–9.) However, in August 2018, the named plaintiffs in

20   *Harris* moved for class certification only on the disparate-treatment claim. (Docs. 85 ¶ 105;

21   94 ¶ 105.) At this point, Union Pacific argues the tolling on Brasier's disparate-impact

22   claim ended. (Doc. 84 at 8–9.)

23       When the *Harris* plaintiffs excluded the disparate-impact claim in their motion for

24   class certification, Brasier did not file an administrative charge or individual suit for his

25   disparate-impact claim. (Docs. 85 ¶¶ 104–07; 94 ¶¶ 104–07.) Instead, he waited for the

26   Eighth Circuit's decision on whether to affirm the district court's granting of class

27

28   ---
     [12] In its November 24, 2021 Order, and at Union Pacific's request, the Court took judicial
     notice of the class-action *Harris* Complaint filed at Doc. 16-1. (Doc. 40 at 2 n.1.)

certification. (*See* Docs. 85 ¶¶ 106–07; 94 ¶¶ 106–07.) The Eighth Circuit reversed, decertifying the class in March 2020. *Harris v. Union Pac. R.R. Co.*, 953 F.3d 1030, 1032 (8th Cir. 2020). Brasier filed a charge with the EEOC and Arizona Office of the Attorney General the following month. (Docs. 85 ¶¶ 106–07; 94 ¶¶ 106–07.) Even so, under Union Pacific's reasoning, this was too late. If tolling on the disparate-impact claim ended with the August 2018 motion for class certification, then Brasier had until June 2019 to file his administrative charge, and it is undisputed that Brasier did not meet this deadline. (Docs. 84 at 8; 85 ¶¶ 106–07; 94 ¶¶ 106–07.)

Whether Brasier's disparate-impact claim is timely thus turns on whether *American Pipe* tolling ended when the named plaintiffs did not include this claim in their motion for class certification *or* when the Eighth Circuit decertified the class. In support of the former, Union Pacific points to several district court orders that concluded *American Pipe* tolling for other *Harris* plaintiffs' disparate-impact claims ended at the motion for class certification and were thus untimely. *See Smithson v. Union Pac. R.R. Co.*, 602 F. Supp. 3d 974, 979 (W.D. Tex. 2022); *Carrillo v. Union Pac. R.R. Co.*, No. EP-21-CV-00026-FM, 2021 WL 3023407, at *5 (W.D. Tex. July 16, 2021).[13] In each of these cases, the district court extended the reasoning of the Fifth Circuit's opinion in *Hall v. Variable Annuity Life Ins. Co.*, 727 F.3d 372, 376 (5th Cir. 2013). *Hall* is not controlling law and the facts here fail to justify extending its holding. Central to *American Pipe* tolling is

---

[13] The Magistrate Judge, in agreeing with Union Pacific, also found persuasive *Blankinship v. Union Pac. R.R. Co.*, No. CV-21-00072-TUC-RM, 2022 WL 4079425, at *4 (D. Ariz. Sept. 6, 2022), *motion for relief from judgment denied*, No. CV-21-00072-TUC-RM, 2022 WL 16715467 (D. Ariz. Nov. 4, 2022). In *Blankinship*, the court relied in part on Fourth, Ninth, and Tenth Circuit cases which stand for the principle that, when plaintiffs file a motion for class certification, any narrowing of a class definition narrows the class of *plaintiffs* to whom tolling may apply. *See id.* at *4; *see also Smith v. Pennington*, 352 F.3d 884, 894, 896 (4th Cir. 2003); *In re Syntax Corp. Sec. Litig.*, 95 F.3d 922, 936 (9th Cir. 1996); *Sawtell v. E.I. du Pont de Nemours & Co.*, 22 F.3d 248, 253–54 (10th Cir. 1994). That reasoning, however, does not apply here. To the extent the *Harris* plaintiffs narrowed the definition of the class by abandoning the disparate-impact claim, that narrowing did not exclude Brasier from the class. Unlike the plaintiffs in *Smith*, *In re Syntax Corp.*, and *Sawtell*, who were excluded by the class definition, Brasier remained a class member with his disparate-treatment claim and was not altogether excluded from *American Pipe* tolling.

maintaining the purpose of the statute of limitations—providing defendants with fair notice and ensuring plaintiffs do not sleep on their rights. *Crown, Cork*, 462 U.S. at 352. Each of those aims is accomplished by tolling Brasier's disparate-impact claim.

Whether construed under a disparate-impact or disparate-treatment theory, Union Pacific had fair notice of the allegations, evidence, and witnesses relevant to Brasier's claim of unlawful screening. Indeed, the underlying class-action complaint alleged both theories. (Doc. 16-1 ¶¶ 141–53.) The district court also certified the class to consist of: "All individuals who have been or will be subject to a fitness-for-duty examination as a result of a reportable health event at any time from September 18, 2014 until the final resolution of this action."[14] *Harris*, 329 F.R.D. at 628. At the forefront of the district court's analysis was Union Pacific's "'1% Rule' regarding the risk of 'sudden incapacitation.'" *Id.* at 620. The district court noted "most of the employees allegedly are either discharged or constructively discharged by the '1% rule.'" *Id.* at 624. The facts relevant to Brasier's disparate-impact claim fell squarely within these allegations.

Under both a disparate-treatment and disparate-impact theory, Brasier's unlawful-screening claim centers on a single qualification standard—Union Pacific's 1% rule—and its application to him, which he argues cost him his job. (Docs. 13 ¶¶ 42–48; 93 at 23; 120 at 2–3.) Brasier relies on no statistical or empirical evidence, and although Union Pacific contends the two theories generally involve different factual issues and evidence, it cannot identify any specific differences here. (*See* Doc. 122 at 7; Oral Argument.) Union Pacific received proper notice and faces no "unfair surprise" when it cannot identify any meaningful difference between defending against Brasier's disparate-impact and disparate-treatment claims. *See Crown, Cork*, 462 U.S. at 353.

Tolling Brasier's claim is also consistent with the aim of preventing plaintiffs from sleeping on their rights. At no point did Brasier wait unreasonably to prosecute his claim. He allowed the named plaintiffs to represent his interests in the underlying class action,

---

[14] In certifying this class, the district court noted the named plaintiffs' three ADA claims and did not clarify under which claims they sought class certification. *See Harris*, 329 F.R.D. at 621.

which directly challenged Union Pacific's 1% rule. One month after the Eighth Circuit decertified the class action, he filed his administrative charge. It was not unreasonable delay for Brasier to wait for certification of the *Harris* class, which challenged the 1% rule under a disparate-treatment theory, before filing an individual charge and lawsuit, challenging the 1% rule under a disparate-impact theory. To hold otherwise would have required Brasier to simultaneously litigate the 1% rule in a class action and individual suit. Such a requirement would frustrate "the purposes of litigative efficiency and economy that [Rule 23] . . . was designed to serve," *see Am. Pipe*, 414 U.S. at 556, and encourage needlessly duplicative litigation.[15]

The Court therefore finds no persuasive authority for a rule which would require that Brasier's "individual suit must be identical in every respect to the class suit for the statute to be tolled." *See Tosti v. City of L.A.*, 754 F.2d 1485, 1489 (9th Cir. 1985) (former class plaintiff could allege slightly different discrimination claims in individual suit because they "involved the same allegations" and the defendant had "ample notice" of the nature of the claims). The pleading of the disparate-impact claim in the *Harris* class-action complaint gave Union Pacific ample notice. *See id.*; *Crown, Cork*, 462 U.S. at 352. And the close factual nexus between the *Harris* plaintiffs' disparate-treatment claim on the 1% rule and Brasier's disparate-impact claim on the 1% rule demonstrates Brasier reasonably relied on the *Harris* plaintiffs to advance his rights. *See Fontana v. Haskin*, 262 F.3d 871, 877 (9th Cir. 2001) ("Specific legal theories need not be pleaded so long as factual averments show that the claimant may be entitled to some relief."); *Clemons v. Crawford*, 585 F.3d 1119, 1124 (8th Cir. 2009) ("[W]ell-pleaded facts, not legal theories or conclusions, determine [the] adequacy of [t]he complaint."). *American Pipe* tolling applied to Brasier's disparate-impact claim until class certification was denied. *See Crown, Cork*,

---

[15] The advisory note to Rule 23(b)(3) recognizes that class actions can "achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." "Class litigation . . . advances judicial economy by eliminating the need for duplicative proceedings pertaining to each class member." *Garland v. Aleman Gonzalez*, 142 S. Ct. 2057, 2077 (2022) (Sotomayor, J., concurring in part). A rule encouraging parallel and duplicative litigation proceedings would undermine these ends.

1  462 U.S. at 352. Brasier's disparate-impact claim is thus timely.

2  **2.      Union Pacific's Remaining Arguments**

3  Aside from the arguments addressed in the R&R, Union Pacific also contends

4  Brasier's unlawful-screening claim fails as a matter of law for three additional reasons: (1)

5  Union Pacific issued Brasier's work restrictions based on Dr. Belanger's April 2016 report

6  rather than the 1% rule (Doc. 84 at 20–21); (2) Brasier cannot pursue an unlawful-screening

7  claim on a "regarded as" theory of disability (*Id.* at 21); and (3) Union Pacific's 1% rule is

8  consistent with a business necessity. (*Id.* at 23–26.)

9  **i.      Basis for Work Restrictions**

10  Union Pacific's argument that it issued Brasier work restrictions based on Dr.

11  Belanger's April 2016 report rather than the 1% rule turns on disputed facts. The parties,

12  as discussed above, dispute whether Brasier sent and Union Pacific received the August

13  2016 follow-up report. (Docs. 85 ¶ 38; 94 ¶ 38.) If Union Pacific had received the follow-

14  up report, a reasonable factfinder could conclude that Union Pacific's reliance on the older

15  report was unwarranted. More importantly, there is evidence in the record showing Union

16  Pacific was more concerned about Brasier's seizure risk than any cognitive difficulties. Dr.

17  Holland's note in the FFD decision, for instance, mentions Brasier's increased seizure risk

18  but not his cognitive difficulties. (Doc. 92-6 at 2.) The basis for the work restrictions issued

19  by Union Pacific is therefore a genuine dispute of material fact precluding summary

20  judgment.

21  **ii.      "Regarded As" Theory**

22  Union Pacific's contention that Brasier cannot proceed with an unlawful-screening

23  claim based on a regarded-as-disabled theory conflicts with federal regulations. The federal

24  regulations implementing the ADA's equal employment provisions state the following:

25  an individual is "***regarded as*** having such an impairment" if the individual is
subjected to a prohibited action because of an actual or perceived physical or

26  mental impairment, whether or not that impairment substantially limits, or is
perceived to substantially limit, a major life activity. Prohibited actions

27  ***include but are not limited to*** refusal to hire, demotion, placement on
involuntary leave, termination, ***exclusion for failure to meet a qualification***

28  ***standard***, harassment, or denial of any other term, condition, or privilege of
employment

- 26 -

29 C.F.R. § 1630.2(l)(1) (emphasis added). To be sure, it makes little sense that employers may regard employees as disabled and discriminate against them based on that perception but avoid ADA liability because their perception turned out to be incorrect. Under § 1630.2(l)(1), Brasier may allege unlawful-screening based on the regarded-as-disabled theory.

### iii.        Business-Necessity Defense

Union Pacific contends it is entitled to judgment as a matter of law under its business-necessity defense. To successfully assert the business-necessity defense to an allegedly discriminatory application of a qualification standard, an employer bears the burden of showing that the qualification standard is (1) job-related; (2) consistent with business necessity; and (3) that performance cannot be accomplished by reasonable accommodation. 42 U.S.C. § 12113; *Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 995 (9th Cir. 2007). In *Bates*, the Ninth Circuit analyzed whether United Parcel Service (UPS) could impose a Department of Transportation (DOT) hearing standard on all of its drivers. 511 F.3d at 981. The DOT only mandated its hearing standard for drivers of vehicles over 10,000 pounds. *Id.* at 981–82. UPS, however, applied the hearing standard to drivers of all of its vehicles, regardless of vehicle weight. *Id.* UPS argued it was entitled to rely on the government safety standard because its vehicles were more like DOT-regulated 10,000-pound-plus vehicles than passenger cars. *Id.* at 998. Therefore, according to UPS, its vehicles also required a similar level of hearing to be operated safely even if they did not weigh 10,000-pounds. *Id.* The Ninth Circuit held that whether the risk of driving a UPS vehicle was more like driving a larger DOT-regulated vehicle or a passenger car was a factual question. *Id.* UPS was thus not entitled to summary judgment based on its reliance on the DOT's purportedly analogous safety standard. *Id.* The Ninth Circuit remanded the case for further proceedings, noting the "[a]pplication of the business necessity defense is fact-intensive and requires close analysis by the district court." *Id.* at 997 n.14.

Like the fact-intensive business-necessity defense in *Bates*, Union Pacific's business-necessity defense turns on factual disputes not to be resolved at summary

judgment. At the heart of Union Pacific's business-necessity defense is its argument that relying on the trucking industries' FMCSA Handbook to evaluate seizure risk for train conductors is both job-related and consistent with a business necessity to promote workplace safety. (Doc. 84 at 23–25.) Like the employer in *Bates*, which argued that driving its vehicles was more like driving a larger DOT-regulated vehicle than a passenger car, Union Pacific argues that a conductor's role in operating its 5,000-ton trains is analogous to operating large commercial vehicles.[16] (Doc. 84 at 23.) The employer in *Bates* also argued, as Union Pacific does here, that these similarities justify reliance on a federal safety standard; the employer in *Bates* relied on the DOT's hearing standard and Union Pacific relies on the FMCSA Handbook's guidelines for seizure risk. (Doc. 84 at 23–25.)

The record, when considered in the light most favorable to Brasier, shows there are genuine disputes of material fact that preclude summary judgment on Brasier's unlawful-screening claim. Even so, Union Pacific contends "the normal principles of Rule 56 do not apply" because disparate-impact claims are tried before a judge rather than a jury. (Doc. 122 at 3–4.) That any of Brasier's claims will eventually be tried before the Court does not convert Union Pacific's Motion for Summary Judgment into a bench trial. At a bench trial, the factfinder resolves conflicts in the testimony, weighs the evidence, and draws reasonable inferences from basic facts to ultimate facts. *Thompson v. Comm'r*, 631 F.2d 642, 646 (9th Cir. 1980); *Calandro v. Sedgwick Claims Mgmt. Servs., Inc.*, 919 F.3d 26, 33 (1st Cir. 2019). A court cannot engage in such factfinding when ruling on a motion for summary judgment. *See Scott*, 550 U.S. at 378. The Court must, at this stage in litigation, draw all reasonable inferences in Brasier's favor.

Based on the foregoing, the Court will sustain Brasier's Objection, reject the Magistrate Judge's R&R as to Count Two, and deny Union Pacific's Motion for Summary Judgment as to Count Two.

//

---

[16]  The parties dispute whether a conductor operates the train but agree that the conductor plays a part in train operations. (Docs. 85 ¶ 2; 94 ¶ 2.)

**IV.    Conclusion**

Accordingly,

**IT IS HEREBY ORDERED:**

1.      Union Pacific's Objection (Doc. 121) is **overruled**.

2.      Brasier's Objection (Doc. 120) is **sustained**.

3.      The R&R (Doc. 115) is **adopted** as to Count One and **rejected** as to Count Two.

4.      Union Pacific's Motion for Summary Judgment (Doc. 83) is **denied**.

5.      The parties shall file their Joint Proposed Pretrial Order, a form for which may be found at https://perma.cc/SK55-JKK4, within **30 days** from the date of this Order. The parties shall include in the JPPO their availability for trial during the months of July and August 2023.

6.      A telephonic Pretrial Hearing is set for **May 4, 2023, at 2:00 p.m**. The parties will receive an email with call-in instructions prior to the Hearing.

Dated this 31st day of March, 2023.

Honorable Jennifer G. Zipps
United States District Judge